1  Daniel L. Germain (Bar No. 143334)
   ROSMAN & GERMAIN LLP
2  16311 Ventura Blvd., Suite 1200
   Encino, CA 91436-2152
3  Telephone: (818) 788-0877
   Facsimile: (818) 788-0885
4
   Eric L. Zagar (Bar No. 250519)
5  Louis E. Mova
   BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
6  280 King of Prussia Road
   Radnor, PA 19087
7  Telephone:  (610) 667-7706
   Facsimile:  (267) 948-2512
8
   *Attorneys for Plaintiffs*
9
                **UNITED STATES DISTRICT COURT**
10
                **CENTRAL DISTRICT OF CALIFORNIA**
11

12

13  M. AILEEN MORNINGSTAR and      )
    ALICE SLETTEDAHL, Derivatively  )   CASE NO. **CV11 · 00655** DSF (JCGx)
14  on Behalf of Nominal Defendant RINO )
    INTERNATIONAL CORPORATION,      )   **VERIFIED SHAREHOLDER
15                                  )   DERIVATIVE COMPLAINT**
                                    )
16              Plaintiffs,         )
                                    )
17       v.                         )
                                    )
18  QIU JIANPING, ZOU DEJUN,        )   **JURY TRIAL DEMANDED**
19  KENNITH C. JOHNSON, QUAN XIE,   )
    BEN WANG, LI YU, BRUCE          )
20  RICHARDSON, YI LIU and ZHANG    )
    WEIGUO,                         )
21                                  )
22              Defendants,         )
                                    )
23                                  )
24       and                        )
                                    )
25  RINO INTERNATIONAL              )
26  CORPORATION,                    )
                                    )
27              Nominal Defendant.  )
28

─────────────────────────────────
                    - 1 -

             VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs M. Aileen Morningstar and Alice Slettedahl ("Plaintiffs"), by the undersigned attorneys, submit this Verified Shareholder Derivative Complaint (the "Derivative Complaint") on behalf of nominal defendant RINO International Corporation ("RINO" or the "Company") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant RINO against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law.

2.      In the past few years, hundreds of mid-market Chinese entities have obtained U.S. listings through a back-door maneuver known as a "reverse takeover" in which an active Chinese business merges into a dormant American shell corporation that is registered for public trading.  One of the problems with these Chinese companies is that their financial filings with the U.S. Securities and Exchange Commission ("SEC") often diverge from those with China's State Administration for Industry and Commerce ("SAIC") by drastic amounts.  Furthermore, these companies fall between the cracks of market regulations.  The SEC's enforcement staff cannot subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S.

3.      One example of these Chinese companies is RINO, which describes itself as a provider of clean technology solutions to China's iron and steel industry, and as being "engaged in the business of environmental protection and remediation."  RINO's sole business activities are acting as a holding company for its direct and indirect subsidiaries, which consist of the "designing, manufacturing, installing and servicing wastewater treatment and flue gas desulphurization ["FGD"] equipment principally for use in China's iron and steel industry, and anti-oxidation products and equipment designed for use in the manufacture of hot rolled steel plate products."

4.      The financial filings of RINO submitted to the SAIC have not been consistent with filings submitted to the SEC.  Indeed, substantial disparities between the two sets of filings demonstrate that the Individual Defendants issued materially false and misleading statements and omitted material facts that rendered their affirmative statements misleading as they related to the Company's financial performance, business prospects, and financial condition.  In fact, RINO's SAIC reports and financial statements

indicate that the Company is far smaller than its SEC filings indicate, and has generated just a fraction of its SEC-reported revenue.

5.     In breach of their fiduciary duties to the Company, the Individual Defendants (defined herein) knowingly engaged in improper financial reporting and accounting practices, and disseminated false and misleading financial statements in violation of SEC regulations and Generally Accepted Accounting Principles ("GAAP").  Each of the Individual Defendants knowingly disseminated inaccurate and misleading financial information regarding the Company, and these misrepresentations of the Company's financials, via submissions to the SEC and the SAIC, constitute a breach of their fiduciary duties to the Company.

6.     As a result, the Company disseminated materially false and misleading financial results to its shareholders for fiscal year 2008, fiscal year 2009, and the first and second quarters of fiscal year 2010, and correspondingly filed materially false and misleading financial statements with the SEC.  The Company has recently admitted that its financial statements were false and misleading when issued, and is in the process of restating its financial statements.

7.     The Individual Defendants' improper accounting practices affected every financial statement the Company filed with the SEC between May 2008 and August 2010.

8.     On November 10, 2010, the research firm Muddy Waters, LLC ("Muddy Waters") initiated coverage of RINO with a "strong sell" rating, and issued a scathing research report on the Company which illustrated how RINO's financial statements were unreliable and overstated, and which questioned managements' integrity and their positioning of the business.  For example, the research report stated that RINO's "financial statements show substantially inflated revenues, profits, and assets.  Not only has RINO's management failed to make required income transfers to the Company, but they have directed tens of millions of dollars from RINO into their wholly owned company."  Additionally, the research report stated that "RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue.  We spoke with knowledgeable people at nine of RINO's purported customers.  Five of the nine deny having purchased FGD systems from RINO.  It is likely that RINO fabricated a sixth customer relationship (Bao Steel) from this group as well.  Only three customers from the group confirm having purchased FGD systems from RINO. …  Because FGD historically represents approximately 60%

- 75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue."

9.     Following the release of this report, the Company shares immediately declined $2.34 per share, or over 15 percent.  In the following days, RINO's shares continued to decline an additional $7.11 per share before trading in the shares was halted on November 17, 2010.  Before trading was halted, RINO's shares had fallen a total of $9.45 per share, or over 68 percent, as additional news about the Company emerged.

10.    On November 19, 2010, the Company disclosed that it had received a letter from its auditor which stated that RINO's CEO had informed the auditor that "as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable."  The auditor's letter also advised the Company "to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."

11.    Also on November 19, 2010, the Company disclosed that RINO's Board of Directors had "concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009 … and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."  Additionally, the Company disclosed that its conclusion that RINO's previously issued financial statements could no longer be relied upon was based on statements made to the Board by the CEO, who after consultation with RINO's Chief Accountant, "reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the Registrant's 2008 and 2009 fiscal years."

12.    On December 2, 2010, the Company disclosed that the SEC was conducting "a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present."  The Company further announced that

the NASDAQ stock market had informed RINO that its shares were going to be delisted, based upon RINO's disclosure that "its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon" and the Company's "admission that it had not entered into certain previously disclosed contracts."

13.     Finally, on December 8, 2010, RINO's shares finally resumed trading, after having been halted for three weeks.  By the end of that day, the Company's shares had declined an additional $2.92 per share, or over 48 percent, to close on December 8, 2010 at $3.15 per share, on heavy trading volume.  As a result of the above, RINO's shares have declined from a closing price of $15.52 on November 9, 2010 (the day before the Muddy Waters report was released) to a closing price of $3.15 per share on December 8, 2010 (the day they resumed trading).  Cumulatively, RINO's shares declined $12.97 per share, or almost 80 percent, during this time.

14.     As a result of the Individual Defendants' misconduct, RINO has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's internal investigation and SEC investigation, and costs and expenses incurred in connection with the Company's restatements of its historical financial statements.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  According to public records, RINO is an active corporation that is "qualified and authorized to transact business in the State of California," and maintains an office at 30211 Avenida De Las Banderas, Suite 200, Rancho Santa Margarita, California.  Further according to public records, RINO is the owner of record, along with defendants Jianping and Dejun, of property located at 31232 Via Colinas, Coto De Caza, California.

**PARTIES**

17.     Plaintiff M. Aileen Morningstar, a citizen of the Commonwealth of Pennsylvania, is a shareholder of RINO, was a shareholder of RINO at the time of the wrongdoing alleged herein, and has been a shareholder of RINO continuously since that time.

18.     Plaintiff Alice Slettedahl, a citizen of the State of California, is a shareholder of RINO, was a shareholder of RINO at the time of the wrongdoing alleged herein, and has been a shareholder of RINO continuously since that time.

19.     Nominal Defendant RINO is a Nevada corporation with its principal executive offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China. According to public records, RINO is an active corporation that is "qualified and authorized to transact business in the State of California," and maintains an office at 30211 Avenida De Las Banderas, Suite 200, Rancho Santa Margarita, California.  Additionally, RINO's Agent for Service of Process is located at 43 Maple Leaf, Mission Viejo, California.  Further according to public records, RINO is the owner of record, along with defendants Jianping and Dejun, of property located at 31232 Via Colinas, Coto De Caza, California.

20.     Defendant Qiu Jianping ("Jianping") has served as the Chairman of the Board of Directors ("Chairman") of RINO since March 2008, and was the acting Chief Financial Officer ("CFO") of the Company during 2009.  Jianping is the wife of defendant Zou Dejun.  Upon information and belief, Jianping is a citizen of the People's Republic of China.  According to public records, Jianping is the owner of record, along with RINO and defendant Dejun, of property located at 31232 Via Colinas, Coto De Caza, California, and the owner of record (with defendant Dejun) of property located at 6 Palma Valley, Coto De Caza, California.

21.     Defendant Zou Dejun ("Dejun") has served as a director of the Company, and as the Company's Chief Executive Officer ("CEO"), since October 2007.  Dejun is the husband of defendant Jianping.  Upon information and belief, Dejun is a citizen of the People's Republic of China.  According to public records, Dejun is the owner of record, along with RINO and defendant Jianping, of property located at 31232 Via Colinas, Coto De Caza, California, and the owner of record (with defendant Jianping) of property located at 6 Palma Valley, Coto De Caza, California.

22.     Defendant Kennith C. Johnson ("Johnson") has served as a director of the Company, and as the Chairman of the Audit Committee of the Board of Directors (the "Audit Committee"), since March 2008.  Johnson is a Certified Public Accountant and holds an MBA in International Corporate Finance.  As detailed in RINO's 2010 proxy statement, "Mr. Johnson's career in public and corporate accounting stretches back to the mid-1970's when he worked for Arthur Andersen's New York audit practice."  Since 2005, Johnson has served as the CFO and Senior Vice President of Fairfax/MFX, an insurance and financial conglomerate.  Additionally, beginning in 2004 through 2008, Johnson served as Chairman of the Audit and Compensation Committee of Interpharm Holdings, an AMEX-listed company.  Further, according to the Company's proxy statement, filed with the SEC on August 27, 2010, RINO's "board of directors [has] determined that our Chairman of the Audit Committee, Mr. Kennith Johnson, qualifies as an "audit committee financial expert."  As a result of the foregoing, it is unquestionable that Johnson is an expert in accounting and financial matters.  Upon information and belief, Johnson is a citizen of the State of New Jersey.

23.     Defendant Quan Xie ("Xie") has served as a director of the Company, and as a member of the Audit Committee, since March 2008.  Upon information and belief, Xie is a citizen of the People's Republic of China.

24.     Defendants Jianping, Dejun, Johnson and Xie are collectively referred to herein as the "Director Defendants."

25.     Defendant Ben Wang ("Wang") has served as the Company's CFO since April 27, 2010.  Upon information and belief, Wang is a citizen of the People's Republic of China.

26.     Defendant Li Yu ("Yu") has served as the Company's Controller and Chief Accounting Officer since November 2009.  Previously, Yu served as the Company's Accounting Manager.  Upon information and belief, Yu is a citizen of the People's Republic of China.

27.     Defendant Bruce Richardson ("Richardson") served as the Company's Secretary and CFO from October 2007 until his resignation in September 2008.  Upon information and belief, Richardson is a citizen of the State of Texas.

28.     Defendant Yi (Jenny) Liu ("Liu") served as the Company's CFO from June 30, 2009 until her resignation on April 27, 2010.  Upon information and belief, Liu is a citizen of the State of Florida.

29.     Defendant Zhang Weiguo ("Weiguo") served as a director of the Company, and as a member of the Audit Committee, from March 2008 until 2010.  Upon information and belief, Weiguo is a citizen of the State of Maryland.

30.     Defendants Jianping, Dejun, Johnson, Xie, Wang, Yu, Richardson, Liu and Weiguo are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements and financial statements issued and/or submitted by the Company.  Because of their advisory, executive, managerial, and directorial positions with RINO, each of the Individual Defendants had knowledge of material non-public information regarding the Company, including, but not limited to, the information which forms the basis of this complaint; specifically, that inaccurate and misleading financial statements were being submitted by the Company.

33.     The Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

34.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company, and by virtue of such duties, the Individual Defendants were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP; and

d.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information.   According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

a.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.     transactions are executed in accordance with management's general or specific authorization; and

ii.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

36.     RINO's Audit Committee Charter provides that the Audit Committee has responsibility for, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.   The appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the audit committee;

b.   Reviewing audit results and annual and interim financial statements and discussing the audited financial statements with both the Company's outside auditors and the Company's management prior to any public filing of those reports;

c.   Reviewing major issues regarding accounting principles and practices that could significantly impact the Company's financial statements;

d.   Discussing with the Company's outside auditors the quality of accounting principles applied in the Company's financial statements and the other matters required by SAS 61 (including amendments or supplements}, such as management judgments and accounting estimates that affect financial statements, significant new accounting policies and disagreements with management;

e.   Overseeing the adequacy of the Company's system of internal accounting controls, including obtaining from the outside auditors management letters or summaries on such internal accounting controls;

f.   Overseeing the Company's procedures for preparing published annual statements and management commentaries;

g.   Overseeing the effectiveness of the internal audit function; and

h.   Overseeing the Company's compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities.

37.   Moreover, RINO maintains a Code of Ethics (the "Code") for its employees and directors, since they "share the privilege and responsibility of upholding [the] Company's ethical reputation."  The Code states, in relevant part:

> All employees and directors of the Company are responsible for complying with this Code. Any employee or director having information concerning any prohibited or unlawful act shall promptly report such matter to the Chief Financial Officer. … While this is the preferred reporting procedure, employees should also feel free to report to anyone in management, including the Board of Directors, the Chief Financial Officer or a Vice President.  It could also be appropriate to contact the Audit Committee of the Board of Directors through its Chairman.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

38.     Additionally, and with respect to "Financial and Accounting Officers and Managers," the Code states:

Financial and accounting officers and managers hold an important and elevated role in corporate governance.  As part of our management team, financial and accounting officers and managers are vested with both the responsibility and authority to protect, balance, and preserve the interests of all of the Company's stakeholders, including shareholders, clients, employees, suppliers, and citizens of the communities in which business is conducted. Financial and accounting officers and managers fulfill this responsibility by prescribing and enforcing the policies and procedures employed in the operation of the Company's financial organization, and by demonstrating the following:

Financial and accounting officers and managers will exhibit and promote the highest standards of honest and ethical conduct through the establishment and operation of policies and procedures that:

- Encourage professional integrity in all aspects of the financial organization, by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal, or alienation from the financial organization or the enterprise itself.

- Prohibit and eliminate the occurrence of conflicts between what is in the best interests of the enterprise and what could result in material personal gain for a member of the financial organization, including Financial and Accounting Officers and Managers.

- Provide a mechanism for members of the finance organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

Financial and accounting officers and managers will establish and manage the enterprise transaction and reporting systems and procedures to ensure that:

- Business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with Generally Accepted Accounting Principles (GAAP) and established company financial policy.

- The retention or proper disposal of Company records shall be in accordance with applicable legal and regulatory requirements.

- Periodic financial communications and reports will be delivered in a manner that facilitates a high degree of clarity of content and meaning so that readers and users can determine their significance and consequence.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of 2008 – 2010 financial statements submitted to the SEC and SAIC by the Company.

**SUBSTANTIVE ALLEGATIONS**

Background

40.     In recent years, a class of Chinese companies has emerged on the international capital markets.  These companies obtain U.S. listings through a back-door maneuver known as a "reverse takeover" ("RTO") and thus avoid initial public offerings, which are more public, slower and more onerous.  Typically, a Chinese business is acquired by a U.S. dormant shell company that is worthless except for its public listing.  The American board then resigns, and the Chinese board takes over.  The company changes its name and issues new stock to hedge funds and other investors, raising millions of dollars in fresh capital.

41.     These Chinese RTO companies often fall between the cracks of market regulation, as the SEC's enforcement staff cannot subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S.  Additionally, many RTO companies admit in prospectuses that they have not gotten required approvals under China's financial regulations.

42.     The Public Company Accounting Oversight Board ("PCAOB"), established under the Sarbanes-Oxley Act to police auditors, recently warned against lax auditing of U.S.-listed Chinese businesses.  The PCAOB plans to ask Congress to lift restrictions on the disclosure of its disciplinary proceedings against accountants.  China is one of several nations that will not let the PCAOB inspect the local auditors used by U.S.-listed companies.

43.     One example of these Chinese RTO companies is RINO.  According to the RINO's Form 10-K, filed with the SEC on March 31, 2009, the Company presently known as RINO was originally incorporated in Minnesota in 1984 as Applied Biometrics, Inc. ("Applied"), for the purpose of developing and marketing a cardiac output monitoring system.  In August 2000, Applied's board of directors determined that Applied would be unable to complete the development of its primary product, and

thereupon ceased its business operations.  During the latter part of 2000, Applied wound down its operations, eliminated most expenses and negotiated the termination or satisfaction of all of the Company's obligations.  In May 2002, Applied filed a Form 15 with the SEC and ceased being a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act").[1]  At a special meeting held on August 4, 2005, Applied's shareholders voted to adopt a plan of complete liquidation and dissolution of Applied.  After that shareholder vote, but before Applied's remaining funds were distributed, a private investor contacted Applied with a proposed reorganization plan.  The plan provided that, in exchange for a $100,000 loan from Glenn A. Little ("Little") (which was subsequently distributed to Applied's shareholders), Little would receive a substantial percentage of Applied's common stock.  At a special shareholders' meeting held on February 8, 2006, Little's proposal was approved and the loan was subsequently converted to 10,000,000 shares of the Company's common stock.  As a result, Little became the Company's majority shareholder with (at the time) 64.1% of the issued and outstanding shares.

44.    Further according to RINO's Form 10-K, in 2006 Applied changed its state of incorporation from Minnesota to Nevada, and authorized Applied's board of directors to change the Company's name from "Applied Biometrics, Inc." to "such other name as the Board deemed appropriate."  Subsequently, the Company's name was changed to "Jade Mountain Corporation" ("Jade").

45.    Then, pursuant to a share exchange agreement (the "Share Exchange") between Jade and Innomind Group Ltd. ("Innomind"), on October 5, 2007 Jade acquired Innomind, Innomind's wholly owned subsidiary, Dalian Innomind, as well as some of the assets and the business of Dalian Innomind's PRC affiliate, Dalian Rino Environment Engineering Science And Technology Co., Ltd. ("Dalian Rino").  Pursuant to the Share Exchange, Jade issued 17,899,643 shares of common stock (the "Control Shares") to Zhang Ze, the nephew of defendants Dejun and Jianping and Innomind's sole shareholder, in exchange for 10 shares of capital stock of Innomind (which represented all of the issued and outstanding shares of Innomind) which were owned by Zhang Ze.  At the completion of the Share Exchange, Dalian Innomind assumed the management of the business activities of Dalian Rino, making Dalian Rino a controlled

---

[1] Form 15 is a "Certification and Notice of Termination of Registration Under Section 12(g) … or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

affiliate of Dalian Innomind, and Innomind a wholly owned subsidiary of RINO.

46.     Simultaneously with the consummation of the Share Exchange, Zhang Ze transferred and conveyed all of the Control Shares to The Innomind Trust, a trust established with Zou Dejun and Qiu Jianping as the sole beneficiaries.  As of December 31, 2008, the Control Shares represented 71.5 percent of RINO's total outstanding common stock, and according to RINO's 2009 Annual Report, filed with the SEC on March 31, 2010, defendants Dejun and Jianping continue to own or control over 65 percent, or 17.9 million of the 28.6 million shares of common stock outstanding.

47.     Also on October 5, 2007, RINO completed a private placement transaction, selling 5,464,357 shares of common stock to investors and raising over $24 million in gross proceeds (the "Securities Purchase Agreement").  In addition to other covenants, the Securities Purchase Agreement provided that 5,580,000 shares of RINO common stock beneficially owned by defendants Dejun and Jianping, through the Innomind Trust, would be subject to escrow in order to secure RINO's obligation under the Securities Purchase Agreement to deliver additional common stock to the private placement investors in the event RINO failed to achieve certain financial performance targets for fiscal years 2007 and 2008 (the "Make Good Escrow Shares").  Thus, in the event RINO did not achieve these financial performance targets during fiscal years 2007 and 2008, it was required to release and distribute the Make Good Escrow Shares to the Private Placement investors, and away from defendants Dejun and Jianping.

48.     Effective May 9, 2008, Jade Mountain Corporation changed the name of the Company to "RINO International Corporation."  Presently, RINO's sole business activities are acting as the holding company of its direct and indirect subsidiaries.

### Defendants' Admission of False Financial Reporting

49.     RINO is required to submit financial statements to both the SEC and the SAIC.  The SAIC government website states that the SAIC functions in maintaining market order and protecting legitimate interests of businesses and consumers by carrying out regulations in the fields of enterprise registration, competition, consumer protection, trademark protection and combating economic illegalities.

50.     The financial statements of RINO submitted to the SAIC often have been wildly inconsistent with filings submitted to the SEC, particularly with regard to the Company's revenues, gross profit and net income.  These discrepancies cannot be attributed to differences between U.S. and Chinese

GAAP, nor to any other legitimate accounting matter.  The only explanation is that one or both sets of financial statements were materially inaccurate and misleading.

51.     Since at least May 15, 2008, the Individual Defendants knowingly caused or allowed the Company to make a series of materially false and misleading statements regarding its financial performance in press releases and in SEC filings.  As known by the Individual Defendants, their improper accounting practices caused RINO's earnings releases and financial statements to misstate the Company's revenue, net income and earnings per share.  Nevertheless, from May 2008 until they were exposed in November 2010, quarter after quarter, year after year, the Individual Defendants knowingly caused or allowed RINO to announce and affirm the Company's false and misleading statements financial results.

52.     On November 10, 2010, Muddy Waters initiated coverage of RINO with a "strong sell" rating.  Muddy Waters also issued a research report on the Company, which stated:

> RINO claims to be the leader in selling desulfurization ("FGD") and other environmental equipment to Chinese steel mills.  It reported 2009 revenue of $193 million.  In reality its revenue is under $15 million, and its management has diverted tens of millions of dollars for its own use.  We value RINO based on the cash we believe remains in the company after the most recent raise.
>
> • RINO's FGD sales (60% to 75% of revenue) are much lower than it claims.  We found that many of its customer relationships do not exist.
>
> • Chinese regulatory filings show that RINO's consolidated 2009 revenue was only $11 million, or 94.2% lower than it reported in the US.  We show that the Chinese numbers are credible.
>
> • RINO's accounting has serious flaws that are clear signs of cooked books.
>
> • RINO's management is draining cash from the company for its own business and personal uses.  The management is in flagrant breach of its VIE agreements, which require it to pay income to RINO (as opposed to taking it).
>
> • RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer.  Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.
>
> • RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known for its failed projects.  Its reported margins are two to three times what they really are. Its technology is sub-par.

•       We are not sanguine about management "borrowing" $3.2 million to purchase a
        luxury home in Orange County, CA the day that RINO closed its $100.0 million
        financing.

**Valuation**

RINO is worth approximately $70 million ($2.45 per share), and falling. In order to fund
its own business ("VIE"), management has drained RINO of cash. At the same time,
management has failed to make required transfers of VIE's profit to RINO.  RINO is
therefore a shell company with at most $70 million in cash (raised, not generated) and
recently acquired assets.

We believe that RINO's actual consolidated revenue (including VIE) is less than $15
million annually – versus the $192.6 that RINO reports. RINO's actual profitability is
marginal at best.   Therefore, even if management were transferring value from VIE to
RINO (rather than the other way around), it would be a negligible addition to the cash
position for valuation purposes.

By most indications, RINO is attempting to make itself into a "real" company with its
Changxing Island project.  However, we do not ascribe a value to the project because we
doubt that it be successful.  (We of course have concerns that management will end up
owning these assets as well.)  RINO's management has not built or run a business of any
scale.  Making a sizable investment in them seems more like a financial sinkhole than an
opportunity for value creation.  Hence, the value of RINO decreases at it burns cash to
further the project.

**Summary and Recommendation:**

We rate RINO International Corp. ("RINO") a Strong Sell. Its financial statements show
substantially inflated revenues, profits, and assets.  Not only has RINO's management
failed to make required income transfers to the Company, but they have directed tens of
millions of dollars from RINO into their wholly owned company.

We discovered that RINO has fabricated a significant number of its purported flue gas
desulfurization ("FGD") system customer relationships.   Public domain information
corroborates our findings. FGD system sales are RINO's largest revenue component,
historically accounting for approximately 60% to 75% of reported revenues.

RINO's 2009 SAIC income statements show consolidated revenue of $11.1 million and a
net loss, versus RINO's reported $192.6 million revenue with net income of $56.4 million.
While it is plausible RINO understates its SAIC revenue by a small amount, we are
confident that it generates no more than $15 million in annual revenue.

RINO's value added tax ("VAT") payment disclosures in its SEC filings greatly contradict
its reported revenues, and are a clear sign of cooked books.  The discrepancies also suggest
money leakage from the Company.

RINO's claim that it had no PRC income tax expense in 2008 and 2009 cannot be true, which also shows significant misstatements in its financials and lack of diligence by its auditor. RINO's explanations of its tax treatment are inconsistent with one another. However, they are consistent in misstating the PRC tax code. (RINO's auditor, Frazer Frost, has been involved in other high profile problem Chinese micro cap companies.)

Because management is abusing the VIE structure. We believe that RINO's shareholders own only a shell company that still has some of the cash they contributed. RINO's CEO and chairwoman (the married couple who founded the business) are blatantly violating the VIE agreements by failing to make any required transfers of income to RINO. Instead, they have pulled out at least $35 million from the Company.

RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that we doubt exist.

RINO is not the industry leader it claims to be in the steel sinter FGD system industry. Rather, it is an obscure company in a crowded market, and seems best known for one to two failed projects. Yet it claims gross margins of 35% to 40% on FGD projects, which are far in excess of those of the leading companies in the industry (generally less than 20%). Its circulating fluidized bed ("CFB") FGD technology is sub-standard in the China FGD industry.

While immaterial compared to their other sins, RINO management's "borrowing" $3.5 million to purchase a luxury home in Orange County gives insight to their character, as well as a window into the dynamics between management, RINO's independent directors, and the Company's auditor.

**Company Description**

RINO designs, sells, manufactures, installs, and services environmental protection equipment for China's iron and steel producers. Its products include flue gas desulfurization ("FGD") systems, wastewater treatment systems, and anti-oxidation systems for hot rolled steel production.

Because FGD systems historically have accounted for 60% to 75% of RINO's revenue, we focus specifically on this line of business.

**RINO has Fabricated FGD Customer Relationships and Significantly Overstated Revenue.**

RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue. We spoke with knowledgeable people at nine of RINO's purported customers. Five of the nine deny having purchased FGD systems from RINO. It is likely that RINO fabricated a sixth customer relationship (Bao Steel) from this group as well. Only three customers from the group confirm having purchased FGD systems from RINO. (However,

as discussed in *RINO's Gross Margins are Improbable Relative to the Rest of the Industry – Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading*, there are issues with one to two of these systems). Because FGD historically represents approximately 60% - 75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue.

The purported FGD customers we found that have not actually purchased RINO FGD systems are the Yueyufeng Steel Group ("Yueyufeng"), Yuhua Steel Co. Ltd ("Yuhua"), the Lai Steel Group ("Lai"), Chongqing Iron & Steel ("Chongqing"), Nanchang Changli Iron & Steel ("Changli"), and most likely Bao Steel ("Bao").

*Yueyufeng relationship is fabricated*

We confirmed that Yueyufeng is not an FGD customer, which means that 2009 revenue is at least $12.7 million lower than reported. A RINO March 2010 investor presentation ("Investor Presentation") claims that Yueyufeng is a significant FGD customer. However, when we spoke with Yueyufeng, our contact stated that it has only one FGD system, and that RINO was not the vendor. The corporate website of Zhuhai Guangjing Environmental Co. Ltd. claims that it designed the FGD system. According to a local newspaper report, the Yueyufeng system uses a technology (wet, double alkali) that is different from those RINO provides. The China Construction Project Bidding website shows that the contract had an initial value of RMB 26.5 million ($3.9 million), which means that the actual vendors that worked on the project received substantially less than RINO claims to have ($12.7 million).

*Yuhua relationship is fabricated*

We confirmed that Yuhua is not an FGD customer. RINO disclosed in its 2008 10-K (filed March 31, 2009) that it had installed an FGD system at Yuhua. However, our contact reported that Yuhua only has one FGD system, and that RINO was not the vendor. Publicly available information on the project also contradicts RINO's claim that Yuhua is an FGD customer. According to the local government of Wuan's record of environmental related projects, the expected completion date of the Yuhua FGD system is December 2009. (We believe but were unable to confirm that the project was not completed until this year.) Therefore, at the time RINO falsely claimed to have installed the FGD system, it was close to one year away from completion (by another vendor).

*Lai relationship is fabricated*

We confirmed that Lai is not an FGD customer. The Investor Presentation claims that Lai is an FGD customer. However, Lai has two FGD systems, and no work was contracted or sub-contracted to RINO. Our contact at Lai is familiar with RINO because he heard that the FGD system RINO built for Jinan Iron & Steel was taken off line. He stated, "[RINO's] technology has no advantage beside not producing wastewater."

*Chongqing relationship is fabricated*

We confirmed that Chongqing is not an FGD customer. RINO's 2009 Form 10-K states that RINO has installed an FGD system at Chongqing. However, our contact stated that Chongqing is currently building its first FGD system. The vendors are Shanghai Liyi Environmental Protection Co., two Chongqing subsidiaries, and China Coal International Group. Specifically, RINO is not a vendor. *Changli relationship is fabricated* We confirmed that Changli is not currently an FGD customer. However, RINO's 2009 Form 10-K states that RINO had installed an FGD system at Changli. Changli is presently soliciting bids for its first FGD system, and RINO is among the companies that have presented proposals.

*Bao relationship is likely fabricated*

We think it is probable that RINO did not work on any FGD projects for Bao or its subsidiaries, despite its claim in the Investor Presentation to have done so. We spoke with a senior Bao executive who was responsible for installing FGD systems on three of Bao's sinters (including at a subsidiary). The executive had never heard of RINO. Moreover, the technical opinion from a Bao engineer that the International Financial Research & Analysis Group provided (in *RINO's Gross Margins are Improbable Relative to the Rest of the Industry – Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading,*) states that Bao never engaged RINO, nor would Bao consider using RINO's CFB technology.

\*      \*      \*

RINO's Disclosures of the Value Added Tax ("VAT") it Pays Greatly Contradict its Reported Revenues.

The inconsistency between VAT and reported revenues highlights the accounting strains resulting from significantly cooking the books. It may also disguise cash leakage from the Company. RINO discloses in the notes to its financial statements the VAT it supposedly paid. The VAT it pays implies that RINO revenues are significantly *greater* than what it actually reports. However, the body of evidence does not suggest that RINO's reporting is conservative. Rather, RINO is overstating revenue. In the PRC, almost all sales of goods are subject to VAT. As RINO explains, it pays VAT of 17% on its sales. By dividing the VAT amounts from the notes by 17%, we arrived at the implied sales numbers. The implied sales are significantly greater than reported sales quarter after quarter.

\*      \*      \*

No Income Tax in 2008 and 2009? Something's Cooking

As we detail on the next page, RINO's SEC filings showing that it had no income tax expense in 2008 and 2009 cannot be correct. (RINO should have paid income taxes of at

least 15% in 2008 and 2009.) We cannot comment on the exact implications of RINO's misstatement. In a general sense though, RINO is committing a complicated accounting fraud with a lot of moving parts.  When the difference between reality and reported numbers is great, it is easy to make mistakes. Claiming zero income taxes in 2008 and 2009 is one such mistake. RINO has had four CFOs in three years, which increases the challenge of committing the fraud.

*        *        *

The Amount of "Paper" Assets on RINO's Balance Sheet is Implausible for its Business.

For RINO, the problem with balance sheets is that they need to balance. As RINO manufactures profits that inflate the equity side of its balance sheet, it needs to show corresponding increases in assets. In China, determined companies are able to find ways of making fraudulent invoices, sales contracts, receipts, etc. relatively easily.  Buying forged paper is obviously less costly than investing in tangible assets.  Auditors vary in their diligence in confirming the authenticity of the aforementioned documents.  There is an ongoing shareholder lawsuit against RINO's current auditor, Frazer Frost LLP (formerly known as Moore, Stephens Wurth Frazer and Torbet, LLP), regarding accounting fraud with another Chinese company.  Frazer Frost also failed to detect a material amount of unauthorized loans taken by the management of China Natural Gas, Inc (CHNG), despite the auditor having previously stated in CHNG's Form 10-K that CHNG had successfully implemented effective internal controls.

(Internal footnotes and citations omitted.)

53.     Upon the release of this report, shares of the Company's stock declined $2.34 per share, or over 15 percent, to close on November 10, 2010 at $13.18 per share, on unusually heavy trading volume.

54.     The Muddy Waters report also discussed a $3.5 million "unsecured and interest free" loan that RINO gave to defendants Dejun (RINO's CEO) and Jianping (RINO's Chairman of the Board) so that they could purchase a residence in Orange County, California.  In this regard, the Muddy Waters report stated:

**While immaterial compared to their other sins, RINO management's "borrowing" $3.5 million to purchase a luxury home in Orange County gives insight to their character, as well as a window into the dynamics between management, RINO's independent directors, and the Company's auditor.**

Mr. Zou and Ms. Qiu borrowed "approximately $3.5 million" on December 7, 2009.  This is the same day that RINO closed its $100.0 million financing.  Two days later the couple bought a luxury home in Orange County, CA assessed at $3.2 million.  (The couple currently has it on the market for $4.0 million: http://www.redfin.com/CA/Coto-De-Caza/31232-Via-Colinas-92679/home/50 54824)  RINO disclosed the "loan" for the first

time in its 2009 Form 10-K, filed on March 31, 2010. The home purchase is less well known.

Some have publicly stated that the couple took the loan out of naïveté about the complicated restrictions of being a public company. We doubt that. *Based on the timeline of events and haphazard means of accounting for this loan, we wonder whether the couple volunteered that they had taken this money; or, whether the auditor uncovered it just before the filing deadline.*

*If the latter, it begs questions of whether involved parties met their fiduciary duties.* Further to that, the manner in which the home was used to secure the loan presents questions.  Finally, RINO claimed that the couple repaid the loan by May 10, 2010; however, the home title was not re-granted to the couple by RINO until sometime between May 28, 2010 and August 18, 2010.

*We doubt that the couple was unaware it was improper to borrow / take money from RINO.*  PRC Company Law article 149 clearly prohibits this action.  Might they have been unaware of this prohibition?  We find that unlikely – stories of minority shareholders getting screwed by management borrowing / taking money from their companies abound in China's newspapers and business circles.  *We are comfortable that they understood their duty not to take money from the company.  They just didn't care.*

The couple transferred ownership of the home to RINO International Corp. as security for the loan on March 22nd, 2010.  This was just before the filing deadline, and makes us think that because they could have transferred it in the three and one-half months prior, it was part of a rushed process.  We therefore infer that the loan was first disclosed / discovered just prior to the home transfer.

The inconsistent manner in which the loan is discussed and accounted for in the Form 10-K adds to our belief that the disclosure / discovery was shortly before the filing deadline.

The notes to the 10-K state that Zou and Qiu borrowed "approximately" $3.5 million, and had repaid $300,000 by the time of filing.  However, the balance sheet netted the $3.5 million against $494,614 RINO owed to the couple as of December 31, 2009, showing a "due from shareholders" balance of $3,005,386.  On the other hand, the cash flow statement shows that during 2009, RINO made a "payment to shareholder" of $5,093,486, while showing "proceeds from shareholder" of $1,532,372, which produces a net amount of $3,561,114.  These inconsistencies indicate that there was a rushed effort to account for the funds.

*If the disclosure / discovery came over three months after the money had been taken, a key question is whether the independent directors believed that taking the money was a mistake made in good faith.*  We may never know the answer, but the manner in which the couple secured the loan is unusual. Rather than RINO merely recording a lien on the home, the couple actually transferred it by grant deed (without consideration) to RINO.  We wonder whether the transfer was viewed as a way to mitigate the risk that the couple would sell the home before repaying the loan.

Another peculiarity in the series of events is that RINO claimed the couple repaid the loan on May 10, 2010; however, RINO did not return full ownership of the home to them until later – and how much later is unclear.  The couple executed a loan agreement with RINO on March 31, 2010 in which they agreed to repay the loan in full on or by May 10, 2010. RINO agreed to return the home within three business days of receiving repayment. RINO's 10-Q states that the couple did in fact repay the loan by this date.  However, on May 14, 2010, RINO executed a deed of trust with the couple, which means they mortgaged the home (with RINO as the lender).  Oddly, the deed of trust states that the loan amount is $3,500 (three thousand five hundred dollars).  If they had repaid the loan at that point, why did RINO refrain from outright granting the home back to them?

On August 18, 2010, the couple recorded a grant deed that returned unencumbered ownership of the home to them.  The conveyance to them was notarized on July 16, 2010, but the date on the deed is May 28, 2010.  These differing dates again make us wonder whether the loan was actually repaid when RINO claims it was.

As we wrote, the amount of money involved in the home transaction is relatively immaterial, but we wonder whether shareholders were denied an earlier opportunity to gain a better understanding of the people running RINO.

(Emphasis added.  Internal references omitted.)

55.     On November 11, 2010, the Company announced that it had commenced an internal review of the issues detailed in the Muddy Waters report.  RINO also stated that it would provide investors "with a timely and detailed response to the allegations upon completion of its internal review." On this news, the Company's shares declined an additional $2.08 per share, or over 15 percent, to close that day at $11.10 per share, again on unusually heavy trading volume.

56.     On November 15, 2010, the Company announced its third quarter 2010 financial results. The Company reported earnings that missed analysts' estimates for the quarter, and lowered its full year sales forecast from its previously estimated range of between $221 million and $229 million down to between $203 million and $211 million – also less than the average analyst estimate.

57.     Also on November 15, 2010, citing allegations of fraud and RINO's initiation of its internal review, an analyst at Canaccord Genuity cut its rating of RINO to "Sell."

58.     On this news, shares of RINO declined $3.46 per share, or over 31 percent, to close on November 15, 2010 at $7.55 per share, on unusually heavy trading volume.

59.     On November 17, 2010, the Company cancelled its third quarter conference call. Thereafter, shares of RINO declined an additional $1.48 per share, or over 19 percent, before trading in

the Company's shares was halted intraday "pending further news from the company."

60.    On November 19, 2010, the Company filed with the SEC a Form 8-K, which in relevant part stated:

> On November 17, 2010 Frazer Frost, LLP, the independent auditors of RINO International Corporation (the "Registrant"), delivered a letter (the "Auditor's Letter") to the Registrant and each of its directors. The Auditor's Letter states in part:

> "In a telephone conversation on November 16, 2010, Mr. Zou Dejun the Chief Executive Officer of the Company, informed Ms. Susan Woo of our firm, in substance, that *as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable. When Ms. Woo inquired about the Company's other contracts, Mr. Zou said he was not sure, but there might be problems with 20 - 40% of them.  Assuming that these statements were reasonably accurate, it appears that our reports would have been affected if this information had been known to us at the date of our reports, although the effect on the financial statements is currently unknown and cannot be quantified without a thorough investigation.*  We further note that in a conversation the following day, November 17, 2010, involving Ms. Woo, several directors of the Company, Company counsel, and Mr. Zou, Mr. Zou stated that he was not sure the day before and went back to look into some things, and found that apart from the two problematic contracts, all other contracts are legitimate and can be verified.

> The auditing standards of the Public Company Accounting Oversight Board provide procedures to be followed by an auditor to prevent continued reliance on audit reports in such circumstances.  *In view of the information provided by Mr. Zou Dejun, we hereby advise the Company to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."*

> On November 17, 2010 certain members of the Board of Directors, including Kennith Johnson, the Chairman of the Audit Committee, Jianping Qiu, the Chairman of the Board of Directors, and Mr. Zou Dejun participated in a conference call with Ms. Susan Woo, a partner of Frazer Frost, LLP in which the foregoing statements were discussed. The two other members of the Board were not available because they were traveling and therefore the Board of Directors could not take any formal action regarding the matters discussed in the Auditor's Letter.  The Registrant intends to have a telephonic meeting of the Board of Directors to further discuss such matters and related matters as soon as all of the members of the Board of Directors are available.

> (Emphasis added.)

61.     Also on November 19, 2010, the Company filed with the SEC a second Form 8-K, which

in relevant part stated:

> On November 18, 2010, ***the Board of Directors (the "Board") of RINO International
> Corporation (the "Registrant") a Nevada corporation, concluded that previously issued
> audited financial statements of the Registrant for its fiscal years ended December 31,
> 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K
> for the fiscal years ended December 31, 2008 and 2009, and previously issued interim
> unaudited financial statements which were included in the Registrant's Quarterly
> Reports on Form 10-Q for the periods ended March 31, 2008 to September 30,
> 2009 should no longer be relied on.***[2]   The Board also concluded that previously issued
> interim unaudited financial statements which were included in the Registrant's Quarterly
> Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30,
> 2010 should no longer be relied on inasmuch as such financial statements incorporate
> results from 2008 and 2009.
>
> The conclusion of the Board that the financial statements for the above-described periods
> should not be relied upon was based on statements made by the Registrant's Chief
> Executive Officer, Mr. Zou Dejun, after consultation with the Registrant's Chief
> Accountant, who reported to the Board that the Registrant did not enter into two contracts
> for which it reported revenue during the Registrant's 2008 and 2009 fiscal years.
>
> Three of the Registrant's Board members, including the Chairman of its Audit Committee
> and Chief Executive Officer, discussed the foregoing matters with the Registrant's
> independent accountant on November 16 and 17, 2010.
>
> The Registrant's Board has authorized its Audit Committee to take all steps necessary to
> investigate the matters set forth above and other allegations of misstatements, and address
> any deficiencies found, including authorization to engage an outside law firm to conduct an
> independent investigation with the assistance of such other professionals as it may require.

(Emphasis added.)

62.     On December 2, 2010, RINO issued a press release entitled "RINO International

Corporation Common Stock to be Delisted by NASDAQ Stock Market."   The press release stated:

> RINO International Corporation (the "Company")(Nasdaq: RINO) announced today that it
> has received a letter from The NASDAQ Stock Market ("NASDAQ") stating that based
> upon its review of the Company and pursuant to NASDAQ Listing Rules 5101, 5250(a)(1)
> and 5250(c)(1), the staff of NASDAQ believes that the continued listing of the Company's
> securities on NASDAQ is no longer warranted (the "NASDAQ Letter").   NASDAQ stated

---

[2] "The Board meeting was held with three of the five sitting members as the other two were unavailable.   It is anticipated that
the other two members will execute waivers of notice of the meeting as the meeting was held without the requisite notice due
to the urgency of the matters considered."   (Footnote in original.)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that its staff's determination was based upon the following:

**1.      The Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;**

**2.      The Company's admission that it had not entered into certain previously disclosed contracts; and**

3.      The Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters, LLC report.

The NASDAQ Letter stated that the statement by the Company's independent auditors that their audit reports for 2008 and 2009 can no longer be relied upon constitutes a violation by the Company of NASDAQ Listing Rule 5250(c)(1).   The letter also states that the Company's failure to respond to a letter from the NASDAQ staff dated November 17, 2010 constitutes a violation of NASDAQ Listing Rule 5250(a).

The NASDAQ Letter further notified the Company that unless the Company requests an appeal of the NASDAQ staff's determination, trading of the Company's common stock will be suspended at the opening of business on December 8, 2010 and a Form 25-NSE will be filed by NASDAQ with the SEC, which will remove the Company's securities from listing and registration on NASDAQ.

The Company does not intend to appeal the NASDAQ staff's determination to delist the Company's common stock. Pending the delisting of the Company's common stock, which is expected to occur on December 8, 2010, the suspension of trading in the Company's common stock, which commenced on November 17, 2010, remains in effect.

The Company currently intends to re-apply for a listing of its common stock on NASDAQ at an appropriate time after the completion of an independent investigation to be conducted by the Audit Committee of the Company's Board of Directors of the allegations contained in a research report issued by Muddy Waters, LLC, the filing of restated financial statements of the Company for its fiscal years ended December 31, 2008 and 2009 and for the quarterly periods included in the Company's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2010 and the Company's satisfaction of all other listing criteria.

(Emphasis added.)

63.      Also on December 2, 2010, the Company filed a Form 8-K, which, in addition to repeating the information contained in the above press release, disclosed:

The Company has been notified by the Staff of the Securities and Exchange Commission (the "SEC") that it is conducting a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present.  The Company is cooperating with the SEC's investigation.  It is

not possible to predict the outcome of the investigation, including whether or when any proceedings might be initiated, when these matters may be resolved or what if any penalties or other remedies may be imposed.

64.     Finally, on December 8, 2010, RINO's shares resumed trading, after having been halted for three weeks.  By the end of the day, the Company's shares had declined an additional $2.92 per share, or over 48 percent, to close at $3.15 per share, on heavy trading volume.

65.     As a result of the above, RINO's shares have declined from a closing price of $15.52 on November 9, 2010 (the day before the Muddy Waters report was released) to a closing price of $3.15 per share on December 8, 2010 (the day they resumed trading).  Cumulatively, RINO's shares have declined $12.97 per share, or almost 80 percent, as news about the Company's false and misleading financial statements emerged during November and December of 2010.

### The Individual Defendants' False and Misleading Statements

66.     As the Individual Defendants have admitted, all of the following SEC filings were false and misleading when filed because the Individual Defendants falsely reported RINO's financial results for each reporting period.

67.     On May 15, 2008, RINO reported its first quarter 2008 financial and operational results. For the quarter, the Company reported net sales of $19 million, quarterly gross profit of $7.7 million, net income of $5 million, and earnings per diluted share of $0.20.

68.     Also on May 15, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal first quarter.  The Company's Form 10-Q was signed by defendant Richardson and reaffirmed the Company's financial results announced on the same day in a press release.   The Company's Form 10-Q also stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Richardson, who certified:

1.     I have reviewed this report on Form 10-Q of RINO International Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

      d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

      a)     All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control

over financial reporting.

*        *        *

[Zou Dejun and Bruce Richardson] hereby certifies, in his capacity as an officer of RINO International Corporation (the "Company"), for the purposes of 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1)    The Quarterly Report of the Company on Form 10-Q for the quarter ended March 31, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

69.    On August 14, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal second quarter.  The Company's Form 10-Q was signed by defendant Richardson, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."   The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Richardson, which were substantially similar to the certifications set forth above.

70.    On August 15, 2008, RINO issued a press release announcing its second quarter 2008 financial results.  The quarterly financial results announced in this press release reaffirmed the Company's financial results reported the previous day in RINO's Form 10-Q.  In announcing "record revenue" for the quarter, the Company reported net sales of $34.6 million, quarterly gross profit of $15.3 million, and GAAP net income of $5.4 million, and earnings per diluted share of $0.21.

71.    On November 11, 2008, RINO reported its third quarter 2008 financial results.   In announcing "record revenue" for the quarter, the Company reported net sales of $44.9 million, quarterly gross profit of $20.6 million, GAAP net income of $9.9 million, and earnings per diluted share of $0.39.

72.    On November 12, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal third quarter.  The Company's Form 10-Q was signed by defendant Dejun, and reaffirmed the Company's financial results announced the previous day in a press release.  The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and contained Sarbanes-Oxley required

certifications, signed by defendants Dejun and Jianping, which were substantially similar to the certifications set forth above.

73.    On March 31, 2009, RINO filed with the SEC its Annual Report on Form 10-K for the 2008 fiscal year.  The Company's Form 10-K was signed by defendants Dejun, Jianping, Weiguo, Xie and Johnson, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."  The Form 10-K also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Jianping, which were substantially similar to the certifications set forth above.

74.    On April 2, 2009, RINO issued a press release announcing its fourth quarter and fiscal year 2008 financial results.  The quarterly and fiscal year financial results announced in this press release reaffirmed the Company's financial results reported on March 31, 2009 in RINO's Form 10-K.  For the quarter, the Company reported net revenue of $40.8 million, quarterly gross profit of $10.8 million, GAAP net income of $1.0 million, and earnings per diluted share of $0.28.  For fiscal year 2008, the Company reported "record 2008 revenue and net income."  Specifically, the Company reported revenue of $139.3 million (an increase of 119.8 percent), gross profit of $54.3 million (an increase of 78.3 percent), GAAP net income of $21.3 million (an increase of 108.3 percent), and earnings per diluted share of $0.85 (an increase of 63.5 percent).  Additionally, the press release announcing RINO's financial results stated:

| Fiscal Year 2008 Results | | | |
|---|---|---|---|
| | **FY 2008** | **FY 2007** | **CHANGE** |
| Sales | $139.3 million | $63.4 million | +119.8 % |
| Gross Profit | $54.3 million | $30.5 million | +78.3 % |
| GAAP Net Income | $21.3 million | $10.2 million | +108.3 % |
| Adjusted Net Income | $38.9 million | $17.7 million | +119.9 % |
| GAAP EPS (Fully Diluted) | $0.85 | $0.52 | +63.5 % |
| Adjusted EPS (Diluted) | $1.55 | $0.90 | +72.2 % |

[Internal footnotes omitted]

\*       \*       \*

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of December 31, 2008 were $19.7 million, representing an increase of 167.1% as compared to $7.4 million as of December 31, 2007, while short term

debt stood at $8.8 million compared to none at the end of 2007. Accounts receivable stood at $51.5 million on December 31, 2008 with days sales outstanding of 115 compared to $19.2 million on December 31, 2007 and corresponding days sales outstanding of 102. Inventories and advances for inventory totaled $23.2 million on December 31, 2008. The Company generated $6.0 million in cash flow from operations for 2008, compared with $5.0 million cash used in operations in 2007. Stockholder's equity increased 182.4% to $66.9 million versus $23.7 million in 2007, with the associated book value on December 31, 2008 of approximately $2.67 per share compared to $0.95 in the year ago period.

75.     On May 15, 2009, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2009 fiscal first quarter. The Company's Form 10-Q was signed by defendant Dejun, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America." The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Jianping, which were substantially similar to the certifications set forth above.

76.     On May 18, 2009, RINO issued a press release announcing its first quarter 2009 financial results. The quarterly financial results announced in this press release reaffirmed the Company's financial results reported on May 15, 2009 in RINO's Form 10-Q. In announcing "record revenue" for the quarter, the Company reported net revenue of $35.6 million, quarterly gross profit of $16 million, net income of $12.5 million, and earnings per diluted share of $0.50.

77.     On August 10, 2009, RINO announced its second quarter 2009 financial results. For the quarter, the Company reported net sales of $40.7 million, quarterly gross profit of $14.2 million, net income of $9.9 million, and earnings per diluted share of $0.39.

78.     Also on August 10, 2009, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2009 fiscal second quarter. The Company's Form 10-Q was signed by defendants Dejun and Liu, and reaffirmed the Company's financial results announced on the same day in a press release. The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Liu, which were substantially similar to the certifications set forth above.

79.     On November 13, 2009, RINO announced "record third quarter 2009 financial results." For the quarter, the Company reported net revenue of $63.3 million, quarterly gross profit of $26.1

million, GAAP net income of $17.1 million, and earnings per diluted share of $0.68.

80.     Also on November 13, 2009, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2009 fiscal third quarter.  The Company's Form 10-Q was signed by defendant Dejun, and reaffirmed the Company's financial results announced on the same day in a press release.  The Form 10-K stated that RINO's financial statements were prepared "in accordance with accounting principles generally accepted in the United States," and also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Liu, which were substantially similar to the certifications set forth above.

81.     On March 31, 2010, RINO reported its fourth quarter and fiscal year 2009 financial results. For the quarter, the Company reported net revenue of $53 million, quarterly gross profit of $16.1 million, GAAP net income of $17.2 million, and earnings per diluted share of $0.68.  For fiscal year 2009, the Company reported revenue of $192.6 million (an increase of 119.8 percent), gross profit of $72.3 million (an increase of 33.1 percent), GAAP net income of $56.4 million (an increase of 165 percent), and earnings per diluted share of $2.22.  Additionally, the press release announcing RINO's financial results stated:

| Fiscal Year 2009 Results | | | |
|---|---|---|---|
| | **FY 2009** | **FY 2008** | **CHANGE** |
| Sales | $192.6 million | $139.3 million | +27.7% |
| Gross Profit | $72.3 million | $54.3 million | +33.1% |
| GAAP Net Income | $56.4 million | $21.3 million | +164.8% |
| Adjusted Net Income | $57.3 million | $38.9 million | +47.3% |
| GAAP EPS (Fully Diluted) | $2.22 | $0.85 | +161.2% |
| Adjusted EPS (Diluted) | $2.26 | $1.55 | +45.8% |

(Internal footnotes omitted)

\*       \*       \*

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of December 31, 2009 were $134.5 million, as compared to $19.7 million on December 31, 2008, mainly resulting from the $100 million registered direct offering closed on December 7, 2009. Accounts receivable stood at $57.8 million as of December 31, 2009, compared to $51.5 million reported on December 31, 2008. Days sales outstanding were 110 and 135 for 2009 and 2008, respectively. Inventories and advances for inventory totaled $39.4 million on December 31, 2009, while advances for equipment and construction material purchase were $9.1 million. The Company generated $30.9 million in cash flow from operations, compared with $6.0 million cash generated in

operation in 2008. Stockholder's equity increased 205.2% to $204.2 million vs. $66.9 million in 2008, with the associated book value on December 31, 2009 of approximately $8.04 per share.

82.     Also on March 31, 2010, RINO filed with the SEC its Annual Report on Form 10-K for the 2009 fiscal year.  The Company's Form 10-K was signed by defendants Dejun, Liu and Li, and reaffirmed the Company's financial results announced on the same day in a press release.  The Form 10-K stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Liu, which were substantially similar to the certifications set forth above.

83.     The Company's 2010 Form 10-K was also the first disclosure that defendants Dejun and Jianping had received a $3.5 million "unsecured and interest free" loan from the Company in order to purchase a residence in Orange County, California.  Notably, although the Company had previously filed a Form 8-K Current Report and issued a press release on December 7, 2009 to disclose that it had completed an equity offering with several institutional investors, wherein RINO disclosed that it had completed an equity offering worth approximately $100 million (as well as sold warrants exercisable for common shares worth up to an additional approximate $78.5 million), Defendants failed to disclose that, *on this very same day*, RINO had provided defendants Dejun and Jianping with this loan.  As belatedly disclosed in RINO's Form 10-K, filed on March 31, 2010:

> On December 7, 2009, the Company made a loan of $3,500,000 to Mr. Dejun Zou and Ms. Jianping Qiu on an unsecured and interest free basis. Mr. Zou and Ms. Qiu are directors and officers of the Company. The loan is short term in nature and to be repaid in the form of cash on or before May 10, 2010.

As further detailed by the Company in its March 31, 2010 Form 10-K, "On March 22, 2010, Mr. Zou and Mrs. Qiu transferred their personal property as a security of the loan borrowed from the Company."

84.     On May 14, 2010, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2010 fiscal first quarter.  The Company's Form 10-Q was signed by defendant Dejun and Richardson, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."  The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Wang, which were substantially similar to the certifications set forth above.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

85.     On May 17, 2010, RINO reported its first quarter 2010 financial results.  The quarterly financial results announced in this press release reaffirmed the Company's financial results reported on May 14, 2010 in RINO's Form 10-Q.   For the quarter, the Company reported net revenue of $47.9 million, quarterly gross profit of $16.7 million, GAAP net income of $18.7 million, and GAAP earnings per diluted share of $0.65.  Additionally, the press release announcing RINO's financial results stated:

> "During the first quarter of 2010, we delivered measured revenue growth through the execution of several major projects, including both desulphurization and wastewater treatment systems," commented Mr. Zou Dejun, President and CEO of RINO International.  "We are pleased with the momentum in our business as evidenced by our backlog and expect a robust second half of the year as the State Environmental Protection Agency (SEPA) maintains a supportive policy to reduce the sulphur emissions for iron and steel producers, while aging wastewater infrastructure systems force prospective customers to accelerate purchase decisions.  We are confident in meeting our projects for $225 million in revenue for 2010, representing 17% growth over 2009.
>
> *       *       *
>
> **Balance Sheet and Cash Flow Discussion**
>
> Cash and cash equivalents as of March 31, 2010 were $97.7 million, representing a decrease of 27.4% as compared to $134.5 million as of December 31, 2009.  At the end of the quarter the Company had working capital of 231.8 million and a current ratio of 7.1 to 1.  Accounts receivable stood at $52.3 million, a 9.6% decrease from $57.8 million reported as of December 31, 2009.

86.     On August 16, 2010, RINO reported its second quarter 2010 financial results.  For the quarter, the Company reported total revenues of $65.4 million, quarterly gross profit of $23.1 million, net income of $20.4 million, and earnings per diluted share of $0.71.   Additionally, the Company's press release announcing its financial results stated:

> **Balance Sheet and Cash Flow Discussion**
>
> Cash and cash equivalents as of June 30, 2010 were $88.0 million, representing a decrease of 34.5% as compared to $134.5 million as of December 31, 2009. At the end of the second quarter, the Company had working capital of $245.2 million and a current ratio of 11 to 1.
>
> *       *       *
>
> **Backlog as of June 30, 2010**
>
> Backlog, defined as projects for which contracts have been signed but which have not been

completed or started, as of June 30, 2010 was $104.7 million. The Company expects that approximately 50% of the currently backlogged contracts will be executed and recognized as revenue by the end of the third quarter, 2010.

| Product Segment | Amount ($ millions) |
|---|---|
| 1.  Desulphurization Systems | 70.8 |
| 2.  Wastewater Treatment | 14.6 |
| 3.  Anti-oxidation Systems | 0.4 |
| 4.  Municipal Sludge Treatment | 18.9 |
| Total | 104.7 |

87.     Also on August 16, 2010, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2010 fiscal second quarter.   The Company's Form 10-Q was signed by defendant Dejun, and reaffirmed the Company's financial results announced on the same day in a press release.   The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and also contained Sarbanes-Oxley required certifications, signed by defendants Dejun and Wang, which were substantially similar to the certifications set forth above.

**THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

88.     The Company's pervasive financial reporting improprieties were the direct result of the Individual Defendants' breaches of fiduciary duties.

89.     In breach of their fiduciary duties, the Individual Defendants knowingly disseminated and filed with the SEC and SAIC inaccurate and inconsistent financial statements and other financial filings, as described above.

90.     In particular, the Individual Defendants reported in the Company's SEC and SAIC filings drastically inconsistent financial results, particularly related to the Company's revenues, gross profit and net income.   The discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, nor to any other legitimate accounting matter.   Indeed, the Individual Defendants have admitted that the Company's SEC filings were false and misleading.

91.     The Individual Defendants, from at least 2008 until 2010, prepared and reviewed all financial statements of the Company, held committee meetings and met with management regularly regarding the Company's accounting practices and compliance with applicable regulations.   As such,

these defendants knew of the reporting problems but did nothing to rectify or prevent them. At a minimum, the Individual Defendants knew that there were inexplicable discrepancies between the Company's SAIC and SEC filings and, therefore, that the SAIC-filed financial statements, SEC-filed financial statements, or both sets of financial statements, were materially inaccurate and misleading. Moreover, the Individual Defendants knew that the Company had not entered into the customer contracts it reported in its SEC filings. Nevertheless, the Individual Defendants made no effort to ensure that the Company corrected its financial statements or prevented future inaccurate and misleading filings.

92. The Individual Defendants breached their fiduciary duties by knowingly employing improper reporting practices at the Company in violation of applicable U.S. and Chinese regulations and by knowingly disseminating inaccurate and inconsistent financial statements and financial filings resulting therefrom.

93. The Individual Defendants further breached their fiduciary duties of loyalty and good faith by granting Dejun and Jianping an illegal and undisclosed "unsecured and interest free" loan and concealing the existence of the loan for more than four months.

94. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with RINO's internal investigation of the misconduct, the SEC's investigation of the Company's misconduct, and the Company's restatements of its historical financial statements, as well as the loss of market-rate interest in connection with the illegal loan to Dejun and Jianping.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

95. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

96. Plaintiffs are shareholders of RINO, were shareholders of RINO at the time of the wrongdoing alleged herein, and have been shareholders of RINO continuously since that time.

97. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

98. As a result of the facts set forth herein, Plaintiffs have not made a demand on the RINO Board to institute this action against Defendants. Such a demand would be a futile and useless act

because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

99.   The Board currently consists of five (5) directors: defendants Jianping, Dejun, Johnson and Xie, and non-defendant Li Zejin.   Each of these directors is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, as follows:

a.   Defendants Dejun and Jianping, who are husband and wife, are identified by RINO as "non-independent directors" of the Company, and cumulatively control a majority of the Company's common stock;[3]

b.   Defendants Dejun and Jianping, who caused RINO to extend to them a $3.5 million "unsecured and interest free" loan so that that they could purchase a residence in Orange County, California, in which Dejun and Jianping stand on both sides and are directly interested;

c.   Defendants Jianping, Dejun, Johnson and Xie, who in December 2009 caused RINO to make the $3.5 million "unsecured and interest free" loan to Jianping and Dejun.  At the time the loan was given to Jianping and Dejun, RINO's Board was composed of Jianping (co-recipient of the loan), Dejun (co-recipient of the loan), Johnson (the Company's "audit committee financial expert"), Xie (an Audit Committee member), and former director Zhang Weiguo (an Audit Committee member at the time the loan was made).  Jianping, Dejun, Johnson and Xie are four of the five directors that currently compose RINO's Board.  That these directors caused RINO to make this illegal "unsecured and interest free" loan to Jianping and Dejun, and then only belatedly disclosed that it was made, demonstrates the Board's utter lack of independence from these two directors, who control the Board and the Company through their positions as majority shareholders and CEO and Chairman of the Board;

d.   In light of their knowledge of and participation in the Company's ongoing improper reporting practices, as alleged in detail herein, defendants Jianping, Dejun, Johnson and Xie each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

e.   Jianping, Dejun, Johnson and Xie, as members of the Board, knowingly approved the filing of and signed inaccurate and inconsistent financial statements in violation of U.S. and Chinese reporting regulations and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties.  Accordingly,

---

[3] According to RINO's 2009 Annual Report, filed with the SEC on March 31, 2010, defendant Dejun owns or controls 58.32 percent of RINO's common stock, and defendant Jianping owns or controls an additional 6.26 percent of RINO's common stock.

defendants Jianping, Dejun, Johnson and Xie are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

f.   Johnson and Xie, as Audit Committee members, had the responsibility, pursuant to the Audit Committee Charter, for:

   i.   The appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the audit committee;

   ii.   Reviewing audit results and annual and interim financial statements and discussing the audited financial statements with both the Company's outside auditors and the Company's management prior to any public filing of those reports;

   iii.   Reviewing major issues regarding accounting principles and practices that could significantly impact the Company's financial statements;

   iv.   Discussing with the Company's outside auditors the quality of accounting principles applied in the Company's financial statements and the other matters required by SAS 61 (including amendments or supplements}, such as management judgments and accounting estimates that affect financial statements, significant new accounting policies and disagreements with management;

   v.   Overseeing the adequacy of the Company's system of internal accounting controls, including obtaining from the outside auditors management letters or summaries on such internal accounting controls;

   vi.   Overseeing the Company's procedures for preparing published annual statements and management commentaries;

   vii.   Overseeing the effectiveness of the internal audit function; and

   viii.   Overseeing the Company's compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities.

   In performing their duties as Audit Committee members, these defendants knew that the Company's financial statements were inaccurate and misleading, yet they knowingly approved the filing and dissemination of the financial statements, and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

g.      Jianping, Dejun, Johnson and Xie's knowing participation in the improper reporting practices, alleged herein, is not, and could not possibly be, the result of an exercise of good faith business judgment.  There is not, and could not possibly be, a good faith business reason to publish at least one, if not two, sets of materially inaccurate and misleading financial statements.  Likewise, there is not, and could not possibly be, a good faith business reason to grant Dejun and Jianping an illegal and undisclosed "unsecured and interest free" loan.  None of defendants' improper conduct is protected by the business judgment rule, and therefore no demand is required.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

100.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

101.    As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

102.    The Individual Defendants knowingly implemented and engaged in improper reporting practices at RINO and knowingly filed inaccurate and inconsistent financial statements and other filings with the SEC and the SAIC, also attesting to their accuracy.  Thus, they breached their fiduciary duties of loyalty and good faith.

103.    The Individual Defendants further breached their fiduciary duties of loyalty and good faith by granting Dejun and Jianping an illegal and undisclosed "unsecured and interest free" loan, as alleged herein.

104.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### Against Defendants Jianping and Dejun for Unjust Enrichment

105.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

106.   Defendants Jianping and Dejun were unjustly enriched by their receipt of the $3.5 million "unsecured and interest free" loan from RINO so that that they could purchase a residence in Orange County, California, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

107.   To remedy the Defendants' unjust enrichment, the Court should order them to pay to the Company market-rate interest on the loan they received from RINO.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Ordering Defendants Jianping and Dejun to pay to the Company market-rate interest on the loan they received from RINO;

C.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

D.   Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

Dated: January 21, 2011

**ROSMAN & GERMAIN LLP**

Daniel L. Germain (Bar No. 143334)
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
Louis E. Moya
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiffs*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY DEMAND

Plaintiffs hereby demand trial by jury.

Dated:  January 21, 2011

**ROSMAN & GERMAIN LLP**

Daniel L. Germain (Bar No. 143334)
16311 Ventura Blvd., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**BARROWAY TOPAZ KESSLER
   MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
Louis E. Moya
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (267) 948-2512

*Attorneys for Plaintiffs*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, M. Aileen Morningstar, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _12/23/2010_      _M. Aileen Morningstar_
                                          M. Aileen Morningstar

**VERIFICATION**

I, Alice Slettedahl, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: Jan. 03, 2011                              *Alice Slettedahl*

                                                 Alice Slettedahl

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 655 DSF (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Daniel L. Germain (State Bar No. 143334)
Rosman & Germain LLP
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M. Aileen Morningstar and Alice Slettedahl,<br>Derivatively on Behalf of Nominal Defendant Rino<br>International Corporation   PLAINTIFF(S)<br>v.<br>Qiu Jianping, Zou Dejun, Kennith C. Johnson, Quan<br>Xie, Ben Wang, Li Yu, Bruce Richardson, Yi Liu,<br>Zhang Weiguo, and Rino International Corporation,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV11·00655**DSF(JC6x)<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Daniel L. Germain_____, whose address is _16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

JAN 2 1 2011

**JULIE PRADO**

Dated: _____

By: _____**SEAL**_____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>M. Aileen Morningstar and Alice Slettedahl, Derivatively on Behalf of Nominal<br>Defendant Rino International Corporation | DEFENDANTS<br>Qiu Jianping, Zou Dejun, Kennith C. Johnson, Quan Xie, Ben Wang, Li Yu,<br>Bruce Richardson, Yi Liu, Zhang Weiguo and Rino International Corporation. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br><br>Daniel L. Germain, Rosman & Germain LLP<br>16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152<br>Telephone: (818) 788-0877 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION (Place an X in one box only.)**

☐ 1 U.S. Government Plaintiff ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only**
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country ☐ 3 | | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN (Place an X in one box only.)**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND: ☒ Yes ☐ No** (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT: $** In excess of $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332(a)(2)

**VII. NATURE OF SUIT (Place an X in one box only.)**

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | | ☐ 380 Other Personal Property Damage | ☐ 530 General | |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | | | ☐ 441 Voting | | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY: Case Number:

# CV11·00655

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): Susan Hufnagle v. Rino International Corp., Case No. CV-10-08695-VBF (VBKx)

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☑A. Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　　☑B. Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　　☑C. For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　　☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Plaintiff Slettedahl is a resident of Riverside County, CA. | Plaintiff Morningstar is a resident of Allegheny County, PA |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Nominal Def. RINO is a Nevada corp. with its principal office in China. Def. Jianping, Dejun, Xie, Wang, Yu, Liu, and Weiguo are residents of China. Def. Johnson is a resident of New Jersey. Def. Richardson is a resident of Texas |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| The property which is, in part, the subject of this action is located 31232 Via Colinas, Coto De Caza, Orange County, California. |  |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date January 21, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |