Curtis B. Coulter (Nevada Bar No. 3034)
**LAW OFFICES OF CURTIS B. COULTER, P.C.**
403 Hill Street, Reno, Nevada 89501
Telephone: (775) 324.3380
Facsimile: (775) 324.3381
ccoulter@coulterlaw.net

*Attorneys for Plaintiffs M. Aileen Morningstar and*
*Alice Slettedahl*

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| M. AILEEN MORNINGSTAR and ALICE SLETTEDAHL, Derivatively on Behalf of Nominal Defendant RINO INTERNATIONAL CORPORATION, | Case No. 2:13-cv-00427-MMD-GWF |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v | |
| QIU JIANPING, ZOU DEJUN, KENNITH C. JOHNSON, QUAN XIE, BEN WANG, LI YU, YI LIU AND ZHANG WEIGUO, | |
| Defendants, | |
| and | |
| RINO INTERNATIONAL CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs M. Aileen Morningstar and Alice Slettedahl ("Plaintiffs"), by the undersigned attorneys, submit this Verified Amended Shareholder Derivative Complaint (the "Derivative Complaint") on behalf of nominal defendant RINO International Corporation ("RINO" or the "Company") against the defendants named herein.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

2.     Venue is proper in this district because nominal defendant RINO is incorporated under the laws of the state of Nevada.  This action was originally filed in the United States District Court for the Central District of California, captioned *Morningstar, et al. v. Jianping, et al.*, No. 2:11-cv-00655, and was transferred to this District by order dated March 12, 2013.

## NATURE OF THE ACTION

3.     This is a shareholder derivative action brought for the benefit of nominal defendant RINO against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law.

4.     In the past few years, hundreds of mid-market Chinese entities have obtained United States listings through a back-door maneuver known as a "reverse takeover" in which an active Chinese business merges into a dormant American shell corporation that is registered for public trading.  One of the problems with these Chinese companies is that their financial filings with the United States Securities and Exchange Commission ("SEC") often diverge from those with China's State Administration for Industry and Commerce ("SAIC") by drastic amounts.  Furthermore, these companies fall between the cracks of market regulations.  The SEC's enforcement staff cannot subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the United States.

5.     RINO is a prime example of the principals of a China-based company taking advantage of the United States capital markets, defrauding its stockholders and making a mockery of the laws of this country.  Although RINO is incorporated under the laws of Nevada, all of the Company's assets are located in China, along with husband and wife defendants Zou Dejun ("Zou") and Qiu Jianping ("Qiu") and who are the controlling stockholders of the Company, and serve as its Chief Executive Officer ("CEO") and Chairman of the Board, respectively.  As set forth herein, Zou and Qiu have essentially used the Company as their own piggy bank, diverting potentially hundreds of millions of dollars to themselves through a variety of illegal transactions, at the direct expense of the Company and its stockholders.

6.     The financial filings of RINO submitted to the SAIC have not been consistent with filings submitted to the SEC.  Indeed, substantial disparities between the two sets of filings demonstrate that the Individual Defendants (as defined herein) issued materially false and misleading statements and omitted material facts that rendered their affirmative statements misleading as they related to the Company's financial performance, business prospects, and financial condition.  In fact, RINO's SAIC reports and financial statements indicate that the Company is far smaller than its SEC filings indicate, and has generated just a fraction of its SEC-reported revenue.

7.     In breach of their fiduciary duties to the Company, the Individual Defendants knowingly engaged in improper financial reporting and accounting practices, and disseminated false and misleading financial statements in violation of SEC regulations and Generally Accepted Accounting Principles ("GAAP").  Each of the Individual Defendants knowingly disseminated inaccurate and misleading financial information regarding the Company, and these misrepresentations of the Company's financials, via submissions to the SEC and the SAIC, constitute a breach of their fiduciary duties to the Company.

8.     As a result, the Company disseminated materially false and misleading financial results to its shareholders for fiscal year 2008, fiscal year 2009, and the first and second quarters of fiscal year 2010, and correspondingly filed materially false and misleading financial statements with the SEC.  The Company has admitted that its financial statements were false and misleading

1  when issued, and has purportedly been in the process of restating its financial statements since

2  November 2010.

3  9.    The Individual Defendants' improper accounting practices affected every financial

4  statement the Company filed with the SEC between May 2008 and August 2010.

5  10.    On November 10, 2010, the research firm Muddy Waters, LLC initiated coverage of

6  RINO with a "strong sell" rating, and issued a scathing research report (the "Muddy Waters

7  Report") on the Company which illustrated how RINO's financial statements were unreliable and

8  overstated, and which questioned management's integrity and its positioning of the business.  For

9  example, the Muddy Waters Report stated that RINO's "financial statements show substantially

10  inflated revenues, profits, and assets.  Not only has RINO's management failed to make required

11  income transfers to the Company, but they have directed tens of millions of dollars from RINO into

12  their wholly owned company."  Additionally, the Muddy Waters Report stated that "RINO has

13  fabricated FGD customer relationships, and therefore significantly overstated revenue.  We spoke

14  with knowledgeable people at nine of RINO's purported customers.  Five of the nine deny having

15  purchased FGD systems from RINO.  It is likely that RINO fabricated a sixth customer relationship

16  (Bao Steel) from this group as well.  Only three customers from the group confirm having

17  purchased FGD systems from RINO. …  Because FGD historically represents approximately 60%

18  - 75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating

19  its revenue."[1]

20  11.    Moreover, the Muddy Waters Report disclosed that the Company had given an

21  interest-free, belatedly disclosed $3.5 million "unsecured and interest free" loan to Zou and Qiu so

22  that they could purchase a residence in Orange County, California.  The loan violated the Sarbanes-

23  Oxley Act of 2002 ("Sarbanes-Oxley"), which prohibits the making of loans to the directors and

24  executive officers of publicly traded corporations.  In connection with the illegal $3.5 million loan,

25  the Muddy Waters Report stated, "[w]e doubt that the couple was unaware it was improper to

---

[1] "FGD systems" refers to flue gas desulphurization systems, purportedly RINO's most important product with respect to revenue generation.

borrow / take money from RINO….[w]e are comfortable that they understood their duty not to take money from the company.  They just didn't care."

12.     Even more egregiously, the $3.5 million loan to Zou and Qiu is just one out of a series of illicit transactions, as described herein, which have unjustly enriched Zou and Qiu with hundreds of millions of dollars at the expense of the Company and its shareholders.

13.     Following the release of the Muddy Waters Report, the Company shares immediately declined $2.34 per share, or over 15 percent.  In the following days, RINO's shares continued to decline an additional $7.11 per share before trading in the shares was halted on November 17, 2010.  Before trading was halted, RINO's shares had fallen a total of $9.45 per share, or over 68 percent, as additional news about the Company emerged.

14.     On November 19, 2010, the Company disclosed that it had received a letter from its independent auditor which stated that RINO's CEO, Zou, had informed the auditor that "as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable."  Zou further admitted that with respect to the Company's other contracts, "there might be problems with 20 – 40% of them."  The auditor's letter also advised the Company "to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."

15.     Also on November 19, 2010, the Company disclosed that RINO's Board had "concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009 … and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."  Additionally, the Company disclosed that its conclusion that RINO's previously issued financial statements could no longer be relied upon was based on statements made to the Board by Zou, who after consultation

with RINO's Chief Accountant, "reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the Registrant's 2008 and 2009 fiscal years."

16.     On December 2, 2010, the Company disclosed that the SEC was conducting "a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present."  The Company further announced that the NASDAQ stock market had informed RINO that its shares were going to be delisted, based upon RINO's disclosure that "its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon" and the Company's "admission that it had not entered into certain previously disclosed contracts."

17.     On April 11, 2011, the SEC ordered an Order of Suspension of Trading in connection with the Company's lack of candor, stating that the "Company has failed to disclose that (i) the outside law firm and forensic accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their investigation to management and the board; (ii) the chairman of the audit committee resigned on March 31, 2011; and (iii) the company's remaining independent directors have also resigned.  Further, questions have arisen regarding, among other things: (i) the size of the company's operations and number of employees; (ii) the existence of certain material customer contracts; and (iii) the existence of two separate and materially different sets of corporate books and accounts." Consequently, Zou and Qiu are the only members of the Board left at the Company at the present time.

18.     To date, RINO's stock has never recovered after news of the Defendants' misconduct emerged.  For comparison, RINO's stock had a price of $15.52 on November 9, 2010 (the day before the Muddy Waters report was released) and as of the filing hereof, RINO's stock trades on the over-the-counter market for approximately $0.05 per share.

19.     As a result of the Individual Defendants' misconduct, RINO has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's internal investigation and the SEC's investigation, costs and expenses incurred in connection with

1  the Company's restatement of its historic financial statements, and, most significantly, the loss of

2  the funds diverted from the Company to its controlling stockholders, Zou and Qiu.

3  **PARTIES**

4  20.    Plaintiff M. Aileen Morningstar, a citizen of the Commonwealth of Pennsylvania,

5  has been a shareholder of RINO continuously since October 28, 2009.

6  21.    Plaintiff Alice Slettedahl, a citizen of the State of California, has been a shareholder

7  of RINO continuously since December 14, 2009.

8  22.    Nominal defendant RINO is a Nevada corporation with its principal executive

9  offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic

10  of China.  RINO describes itself as a provider of clean technology solutions to China's iron and

11  steel industry, and as being "engaged in the business of environmental protection and remediation."

12  RINO's sole business activities are acting as a holding company for its direct and indirect

13  subsidiaries, which consist of the "designing, manufacturing, installing and servicing wastewater

14  treatment and flue gas desulphurization equipment principally for use in China's iron and steel

15  industry, and anti-oxidation products and equipment designed for use in the manufacture of hot

16  rolled steel plate products."  As of the commencement of this action, according to public records,

17  RINO was an active corporation that was "qualified and authorized to transact business in the State

18  of California" and maintained an office at 30211 Avenida De Las Banderas, Suite 200, Rancho

19  Santa Margarita, California.  RINO's Agent for Service of Process is located at 43 Maple Leaf,

20  Mission Viejo, California.

21  23.    Defendant Qiu has served as the Chairman of the Board of RINO since March 2008,

22  and was the acting Chief Financial Officer ("CFO") of the Company during 2009.[2]  Qiu is the wife

23  of defendant Zou.  As of August 2010, Qiu owned approximately 6.26% of the Company's

24  outstanding common shares.    Additionally, Qiu owns 10% of Dalian Rino Environment

25  Engineering Science and Technology Co., Ltd. ("Dalian Rino"), a controlled variable interest

26  entity.  Qiu has also served as a director and Chairman of the board of directors of Dalian

27  _____

[2] Defendant Qiu is referred to interchangeably as "Jianping Qiu" and "Qiu Jianping" in the
Company's SEC filings.

28

Innomind Environment Engineering Co., Ltd. ("Dalian Innomind"), a wholly owned subsidiary of RINO, since July 2007.  Upon information and belief, Qiu is a citizen of the People's Republic of China.

24.     Defendant Zou has served as a director and CEO of the Company since October 2007.[3]  Zou is the husband of defendant Qiu.  As of August 2010, Zou owned approximately 56.32% of the Company's outstanding common shares and, collectively, Zou and Qiu owned approximately 63% of the Company's outstanding common shares.  Zou is the founder and 90% owner of Dalian Rino, and has served as its CEO and a director since 2003.  Together, Zou and Qiu own 100% of Dalian Rino.  Additionally, Zou has served as a director and the CEO of Dalian Innomind since July 2007.  Upon information and belief, Zou is a citizen of the People's Republic of China.

25.     Defendant Kennith C. Johnson ("Johnson") served as a director of the Company, and as the Chairman of the Board's Audit Committee (the "Audit Committee"), from March 2008 until early 2011.  Johnson is a Certified Public Accountant and holds an MBA in International Corporate Finance.  As detailed in RINO's 2010 proxy statement, "Mr. Johnson's career in public and corporate accounting stretches back to the mid-1970's when he worked for Arthur Andersen's New York audit practice."  Since 2005, Johnson has served as the CFO and Senior Vice President of Fairfax/MFX, an insurance and financial conglomerate.  Additionally, beginning in 2004 through 2008, Johnson served as Chairman of the Audit and Compensation Committee of Interpharm Holdings, an AMEX-listed company.  Further, according to the Company's proxy statement, filed with the SEC on August 27, 2010, RINO's "board of directors [has] determined that our Chairman of the Audit Committee, Mr. Kennith Johnson, qualifies as an "audit committee financial expert."  As a result of the foregoing, it is unquestionable that Johnson is an expert in accounting and financial matters.  Upon information and belief, Johnson is a citizen of the State of New Jersey.

---

[3] Defendant Zou is referred to interchangeably as "Dejun Zou" and "Zou Dejun" in the Company's SEC filings.

26.     Defendant Quan Xie ("Xie") has served as a director of the Company, and as a member of the Audit Committee, from March 2008 until early 2011.  Upon information and belief, Xie is a citizen of the People's Republic of China.

27.     Defendants Zou, Qiu, Johnson and Xie are collectively referred to herein as the "Director Defendants."

28.     Defendant Ben Wang ("Wang") has served as the Company's CFO since April 27, 2010.  Upon information and belief, Wang is a citizen of the People's Republic of China.

29.     Defendant Li Yu ("Yu") has served as the Company's Controller and Chief Accounting Officer since November 2009.  Previously, Yu served as the Company's Accounting Manager.   Additionally, since February 28, 2010, Yu has served as Dalian Rino's Chief Accounting Officer.  Upon information and belief, Yu is a citizen of the People's Republic of China.

30.     Defendant Yi (Jenny) Liu ("Liu") served as the Company's CFO from June 30, 2009 until her resignation on April 27, 2010.  Upon information and belief, Liu is a citizen of the People's Republic of China.

31.     Defendant Zhang Weiguo ("Weiguo") served as a director of the Company, and as a member of the Audit Committee, from March 2008 until 2010.  Upon information and belief, Weiguo is a citizen of the State of Maryland.

32.     Defendants Zou, Qiu, Johnson, Xie, Wang, Yu, Liu and Weiguo are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.  Each

director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements and financial statements issued and/or submitted by the Company.   Because of their advisory, executive, managerial, and directorial positions with RINO, each of the Individual Defendants had knowledge of material non-public information regarding the Company, including, but not limited to, the information which forms the basis of this complaint; specifically, that inaccurate and misleading financial statements were being submitted by the Company.

35.     The Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

36.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company, and by virtue of such duties, the Individual Defendants were required to, among other things:

> a.   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.   exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> c.   exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP; and
>
> d.   when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and for ensuring that the Company's financial statements were based on accurate financial information.   According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

     a.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

     b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

         i.    transactions are executed in accordance with management's general or specific authorization; and

         ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

38.     Furthermore, RINO's Audit Committee Charter provides that the Audit Committee members, defendants Johnson, Xie, and Weiguo, were responsible for, among other things:

     a.    The appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the audit committee;

     b.    Reviewing the plan for the audit and related services at least annually;

     c.    Reviewing audit results and annual and interim financial statements and discussing the audited financial statements with both the Company's outside auditors and the Company's management prior to any public filing of those reports;

     d.    Reviewing major issues regarding accounting principles and practices that could significantly impact the Company's financial statements;

     e.    Discussing with the Company's outside auditors the quality of accounting principles applied in the Company's financial statements and the other matters required by SAS 61 (including amendments or supplements), such as management judgments and accounting estimates that affect financial statements, significant new accounting policies and disagreements with management;

f.   Ensuring the receipt of, and reviewing, a formal written statement from the Company's outside auditors delineating all relationships between the outside auditors and the Company, consistent with Independence Standards Board Standard 1;

g.   Reviewing and actively discussing with the Company's outside auditors the auditors' independence, including any disclosed relationship or service that may impact the objectivity and independence of the outside auditors;

h.   Taking appropriate action to oversee the independence of the outside auditors;

i.   Overseeing the adequacy of the Company's system of internal accounting controls, including obtaining from the outside auditors management letters or summaries on such internal accounting controls;

j.   Overseeing the Company's procedures for preparing published annual statements and management commentaries;

k.   Overseeing the effectiveness of the internal audit function;

l.   Overseeing the Company's compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities;

m.   Ensuring that the Company and its management make any appropriate certifications required by the Rules of the SEC and the FINRA;

n.   Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and

o.   Establishing procedures for the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

39.   Lastly, RINO maintains a Code of Ethics (the "Code") that applies to the Individual Defendants as Company employees and directors, since they "share the privilege and responsibility of upholding [the] Company's ethical reputation."  The Code states, in relevant part:

All employees and directors of the Company are responsible for complying with this Code.  Any employee or director having information concerning any prohibited or unlawful act shall promptly report such matter to the Chief Financial Officer. … While this is the preferred reporting procedure, employees should also feel free to report to anyone in management, including the Board of Directors, the Chief Financial Officer or a Vice President.  It could also be appropriate to contact the Audit Committee of the Board of Directors through its Chairman.

40.     Additionally, and with respect to "Financial and Accounting Officers and Managers," the Code states:

> Financial and accounting officers and managers hold an important and elevated role in corporate governance.  As part of our management team, financial and accounting officers and managers are vested with both the responsibility and authority to protect, balance, and preserve the interests of all of the Company's stakeholders, including shareholders, clients, employees, suppliers, and citizens of the communities in which business is conducted.  Financial and accounting officers and managers fulfill this responsibility by prescribing and enforcing the policies and procedures employed in the operation of the Company's financial organization, and by demonstrating the following:

> Financial and accounting officers and managers will exhibit and promote the highest standards of honest and ethical conduct through the establishment and operation of policies and procedures that:

> - Encourage professional integrity in all aspects of the financial organization, by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal, or alienation from the financial organization or the enterprise itself.

> - Prohibit and eliminate the occurrence of conflicts between what is in the best interests of the enterprise and what could result in material personal gain for a member of the financial organization, including Financial and Accounting Officers and Managers.

> - Provide a mechanism for members of the finance organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

> Financial and accounting officers and managers will establish and manage the enterprise transaction and reporting systems and procedures to ensure that:

> - Business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with Generally Accepted Accounting Principles (GAAP) and established company financial policy.

> - The retention or proper disposal of Company records shall be in accordance with applicable legal and regulatory requirements.

> - Periodic financial communications and reports will be delivered in a manner that facilitates a high degree of clarity of content and meaning so that readers and users can determine their significance and consequence.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of 2008 – 2010 financial statements submitted to the SEC and SAIC by the Company.

**SUBSTANTIVE ALLEGATIONS**

**Background**

42.     In recent years, a class of Chinese companies has emerged on the international capital markets.  These companies obtain U.S. listings through a back-door maneuver known as a "reverse takeover" ("RTO") and thus avoid initial public offerings, which are more scrutinized, slower and more onerous.  Typically, a Chinese business is acquired by a U.S. dormant shell company that is worthless except for its public listing.  The American board then resigns, and the Chinese board takes over.  The company changes its name and issues new stock to hedge funds and other investors, raising millions of dollars in fresh capital.

43.     These Chinese RTO companies often fall between the cracks of market regulation, as the SEC's enforcement staff cannot subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S.  Additionally, many RTO companies admit in prospectuses that they have not gotten required approvals under China's financial regulations.

44.     The Public Company Accounting Oversight Board ("PCAOB"), established under the Sarbanes-Oxley Act to police auditors, recently warned against lax auditing of U.S.-listed Chinese businesses.  The PCAOB plans to ask Congress to lift restrictions on the disclosure of its disciplinary proceedings against accountants.  China is one of several nations that will not let the PCAOB inspect the local auditors used by U.S.-listed companies.

45.     One example of these Chinese RTO companies is RINO.  According to the RINO's Form 10-K, filed with the SEC on March 31, 2009, the Company presently known as RINO was originally incorporated in Minnesota in 1984 as Applied Biometrics, Inc. ("Applied"), for the purpose of developing and marketing a cardiac output monitoring system.  In August 2000, Applied's board of directors determined that Applied would be unable to complete the development of its primary product, and thereupon ceased its business operations.  During the latter part of 2000, Applied wound down its operations, eliminated most expenses and negotiated the termination or satisfaction of all of the Company's obligations.  In May 2002, Applied filed a Form 15 with the SEC and ceased being a reporting company under the Securities Exchange Act of 1934,

as amended (the "Exchange Act").[4]  At a special meeting held on August 4, 2005, Applied's shareholders voted to adopt a plan of complete liquidation and dissolution of Applied.  After that shareholder vote, but before Applied's remaining funds were distributed, a private investor contacted Applied with a proposed reorganization plan.  The plan provided that, in exchange for a $100,000 loan from Glenn A. Little ("Little") (which was subsequently distributed to Applied's shareholders), Little would receive a substantial percentage of Applied's common stock.  At a special shareholders' meeting held on February 8, 2006, Little's proposal was approved and the loan was subsequently converted to 10,000,000 shares of the Company's common stock.  As a result, Little became the Company's majority shareholder with (at the time) 64.1% of the issued and outstanding shares.

46.     Further according to RINO's Form 10-K, in 2006 Applied changed its state of incorporation from Minnesota to Nevada, and authorized Applied's board of directors to change the Company's name from "Applied Biometrics, Inc." to "such other name as the Board deemed appropriate."  Subsequently, the Company's name was changed to "Jade Mountain Corporation" ("Jade").

47.     Then, pursuant to a share exchange agreement (the "Share Exchange") between Jade and Innomind Group Ltd. ("Innomind"), on October 5, 2007 Jade acquired Innomind, Innomind's wholly owned subsidiary, Dalian Innomind, as well as some of the assets and the business of Dalian Innomind's PRC affiliate, Dalian Rino.  Pursuant to the Share Exchange, Jade issued 17,899,643 shares of common stock (the "Control Shares") to Zhang Ze, the nephew of defendants Zou and Qiu and Innomind's sole shareholder, in exchange for 10 shares of capital stock of Innomind (which represented all of the issued and outstanding shares of Innomind) which were owned by Zhang Ze.  At the completion of the Share Exchange, Dalian Innomind assumed the management of the business activities of Dalian Rino, making Dalian Rino a controlled affiliate of Dalian Innomind, and Innomind a wholly owned subsidiary of RINO.

---

[4] Form 15 is a "Certification and Notice of Termination of Registration Under Section 12(g) … or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934."

48.     Simultaneously with the consummation of the Share Exchange, Zhang Ze transferred and conveyed all of the Control Shares to The Innomind Trust, a trust established with Zou and Qiu as the sole beneficiaries.  As of December 31, 2008, the Control Shares represented 71.5 percent of RINO's total outstanding common stock, and according to RINO's 2009 Annual Report, filed with the SEC on March 31, 2010, defendants Zou and Qiu continued to own or control over 65 percent, or 17.9 million of the 28.6 million shares of common stock outstanding. Accordingly, at all relevant times, defendants Zou and Qiu have been controlling shareholders of RINO.

49.     Also on October 5, 2007, RINO completed a private placement transaction, selling 5,464,357 shares of common stock to investors and raising over $24 million in gross proceeds (the "Securities Purchase Agreement").   In addition to other covenants, the Securities Purchase Agreement provided that 5,580,000 shares of RINO common stock beneficially owned by defendants Zou and Qiu, through the Innomind Trust, would be subject to escrow in order to secure RINO's obligation under the Securities Purchase Agreement to deliver additional common stock to the private placement investors in the event RINO failed to achieve certain financial performance targets for fiscal years 2007 and 2008 (the "Make Good Escrow Shares").  Thus, in the event RINO did not achieve these financial performance targets during fiscal years 2007 and 2008, it was required to release and distribute the Make Good Escrow Shares to the Private Placement investors, and away from defendants Zou and Qiu.

50.     Effective May 9, 2008, Jade Mountain Corporation changed the name of the Company to "RINO International Corporation."   Presently, RINO's sole business activities are acting as the holding company of its direct and indirect subsidiaries.

### The Individual Defendants' Admission of False Financial Reporting

51.     RINO is required to submit financial statements to both the SEC and the SAIC.  The SAIC government website states that the SAIC functions in maintaining market order and protecting legitimate interests of businesses and consumers by carrying out regulations in the fields of enterprise registration, competition, consumer protection, trademark protection and combating economic illegalities.

52.     The financial statements of RINO submitted to the SAIC often have been wildly inconsistent with filings submitted to the SEC, particularly with regard to the Company's revenues, gross profit and net income. These discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, or to any other legitimate accounting matter. The only explanation is that one or both sets of financial statements were materially inaccurate and misleading.

53.     Since at least May 15, 2008, the Individual Defendants knowingly caused or allowed the Company to make a series of materially false and misleading statements regarding its financial performance in press releases and in SEC filings. As known by the Individual Defendants, their improper accounting practices caused RINO's earnings releases and financial statements to misstate the Company's revenue, net income and earnings per share. Nevertheless, from May 2008 until they were exposed in November 2010, quarter after quarter, year after year, the Individual Defendants knowingly caused or allowed RINO to announce and affirm the Company's false and misleading statements financial results.

54.     On November 10, 2010, Muddy Waters initiated coverage of RINO with a "strong sell" rating. Muddy Waters also issued a research report on the Company, which stated:

> RINO claims to be the leader in selling desulfurization ("FGD") and other environmental equipment to Chinese steel mills. It reported 2009 revenue of $193 million. In reality its revenue is under $15 million, and its management has diverted tens of millions of dollars for its own use. We value RINO based on the cash we believe remains in the company after the most recent raise.
>
> • RINO's FGD sales (60% to 75% of revenue) are much lower than it claims. We found that many of its customer relationships do not exist.
>
> • Chinese regulatory filings show that RINO's consolidated 2009 revenue was only $11 million, or 94.2% lower than it reported in the US. We show that the Chinese numbers are credible.
>
> • RINO's accounting has serious flaws that are clear signs of cooked books.
>
> • RINO's management is draining cash from the company for its own business and personal uses. The management is in flagrant breach of its VIE agreements, which require it to pay income to RINO (as opposed to taking it).
>
> • RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.
>
> • RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known

for its failed projects.  Its reported margins are two to three times what they really are. Its technology is sub-par.

- We are not sanguine about management "borrowing" $3.2 million to purchase a luxury home in Orange County, CA the day that RINO closed its $100.0 million financing.

**Valuation**

RINO is worth approximately $70 million ($2.45 per share), and falling. In order to fund its own business ("VIE"), management has drained RINO of cash. At the same time, management has failed to make required transfers of VIE's profit to RINO. RINO is therefore a shell company with at most $70 million in cash (raised, not generated) and recently acquired assets.

We believe that RINO's actual consolidated revenue (including VIE) is less than $15 million annually – versus the $192.6 that RINO reports. RINO's actual profitability is marginal at best.  Therefore, even if management were transferring value from VIE to RINO (rather than the other way around), it would be a negligible addition to the cash position for valuation purposes.

By most indications, RINO is attempting to make itself into a "real" company with its Changxing Island project.  However, we do not ascribe a value to the project because we doubt that it be successful.  (We of course have concerns that management will end up owning these assets as well.)  RINO's management has not built or run a business of any scale.  Making a sizable investment in them seems more like a financial sinkhole than an opportunity for value creation.  Hence, the value of RINO decreases at it burns cash to further the project.

**Summary and Recommendation:**

We rate RINO International Corp. ("RINO") a Strong Sell. Its financial statements show substantially inflated revenues, profits, and assets.  Not only has RINO's management failed to make required income transfers to the Company, but they have directed tens of millions of dollars from RINO into their wholly owned company.

We discovered that RINO has fabricated a significant number of its purported flue gas desulfurization ("FGD") system customer relationships.   Public domain information corroborates our findings. FGD system sales are RINO's largest revenue component, historically accounting for approximately 60% to 75% of reported revenues.

RINO's 2009 SAIC income statements show consolidated revenue of $11.1 million and a net loss, versus RINO's reported $192.6 million revenue with net income of $56.4 million.  While it is plausible RINO understates its SAIC revenue by a small amount, we are confident that it generates no more than $15 million in annual revenue.

RINO's value added tax ("VAT") payment disclosures in its SEC filings greatly contradict its reported revenues, and are a clear sign of cooked books.  The discrepancies also suggest money leakage from the Company.

RINO's claim that it had no PRC income tax expense in 2008 and 2009 cannot be true, which also shows significant misstatements in its financials and lack of

diligence by its auditor.  RINO's explanations of its tax treatment are inconsistent with one another.  However, they are consistent in misstating the PRC tax code. (RINO's auditor, Frazer Frost, has been involved in other high profile problem Chinese micro cap companies.)

Because management is abusing the VIE structure. We believe that RINO's shareholders own only a shell company that still has some of the cash they contributed. RINO's CEO and chairwoman (the married couple who founded the business) are blatantly violating the VIE agreements by failing to make any required transfers of income to RINO.  Instead, they have pulled out at least $35 million from the Company.

RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer.  Rather, it is filled with low quality "paper" assets that we doubt exist.

RINO is not the industry leader it claims to be in the steel sinter FGD system industry.  Rather, it is an obscure company in a crowded market, and seems best known for one to two failed projects.  Yet it claims gross margins of 35% to 40% on FGD projects, which are far in excess of those of the leading companies in the industry (generally less than 20%). Its circulating fluidized bed ("CFB") FGD technology is sub-standard in the China FGD industry.

While immaterial compared to their other sins, RINO management's "borrowing" $3.5 million to purchase a luxury home in Orange County gives insight to their character, as well as a window into the dynamics between management, RINO's independent directors, and the Company's auditor.

**Company Description**

RINO designs, sells, manufactures, installs, and services environmental protection equipment for China's iron and steel producers. Its products include flue gas desulfurization ("FGD") systems, wastewater treatment systems, and anti-oxidation systems for hot rolled steel production.

Because FGD systems historically have accounted for 60% to 75% of RINO's revenue, we focus specifically on this line of business.

**RINO has Fabricated FGD Customer Relationships and Significantly Overstated Revenue.**

RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue.  We spoke with knowledgeable people at nine of RINO's purported customers.  Five of the nine deny having purchased FGD systems from RINO.  It is likely that RINO fabricated a sixth customer relationship (Bao Steel) from this group as well. Only three customers from the group confirm having purchased FGD systems from RINO. (However, as discussed in *RINO's Gross Margins are Improbable Relative to the Rest of the Industry – Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading*, there are issues with one to two of these systems).  Because FGD historically represents approximately 60% - 75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue.

The purported FGD customers we found that have not actually purchased RINO FGD systems are the Yueyufeng Steel Group ("Yueyufeng"), Yuhua Steel Co. Ltd

("Yuhua"), the Lai Steel Group ("Lai"), Chongqing Iron & Steel ("Chongqing"), Nanchang Changli Iron & Steel ("Changli"), and most likely Bao Steel ("Bao").

*Yueyufeng relationship is fabricated*

We confirmed that Yueyufeng is not an FGD customer, which means that 2009 revenue is at least $12.7 million lower than reported. A RINO March 2010 investor presentation ("Investor Presentation") claims that Yueyufeng is a significant FGD customer. However, when we spoke with Yueyufeng, our contact stated that it has only one FGD system, and that RINO was not the vendor. The corporate website of Zhuhai Guangjing Environmental Co. Ltd. claims that it designed the FGD system. According to a local newspaper report, the Yueyufeng system uses a technology (wet, double alkali) that is different from those RINO provides. The China Construction Project Bidding website shows that the contract had an initial value of RMB 26.5 million ($3.9 million), which means that the actual vendors that worked on the project received substantially less than RINO claims to have ($12.7 million).

*Yuhua relationship is fabricated*

We confirmed that Yuhua is not an FGD customer. RINO disclosed in its 2008 10-K (filed March 31, 2009) that it had installed an FGD system at Yuhua. However, our contact reported that Yuhua only has one FGD system, and that RINO was not the vendor. Publicly available information on the project also contradicts RINO's claim that Yuhua is an FGD customer. According to the local government of Wuan's record of environmental related projects, the expected completion date of the Yuhua FGD system is December 2009. (We believe but were unable to confirm that the project was not completed until this year.) Therefore, at the time RINO falsely claimed to have installed the FGD system, it was close to one year away from completion (by another vendor).

*Lai relationship is fabricated*

We confirmed that Lai is not an FGD customer. The Investor Presentation claims that Lai is an FGD customer. However, Lai has two FGD systems, and no work was contracted or sub-contracted to RINO. Our contact at Lai is familiar with RINO because he heard that the FGD system RINO built for Jinan Iron & Steel was taken off line. He stated, "[RINO's] technology has no advantage beside not producing wastewater."

*Chongqing relationship is fabricated*

We confirmed that Chongqing is not an FGD customer. RINO's 2009 Form 10-K states that RINO has installed an FGD system at Chongqing. However, our contact stated that Chongqing is currently building its first FGD system. The vendors are Shanghai Liyi Environmental Protection Co., two Chongqing subsidiaries, and China Coal International Group. Specifically, RINO is not a vendor. *Changli relationship is fabricated* We confirmed that Changli is not currently an FGD customer. However, RINO's 2009 Form 10-K states that RINO had installed an FGD system at Changli. Changli is presently soliciting bids for its first FGD system, and RINO is among the companies that have presented proposals.

*Bao relationship is likely fabricated*

We think it is probable that RINO did not work on any FGD projects for Bao or its subsidiaries, despite its claim in the Investor Presentation to have done so. We

spoke with a senior Bao executive who was responsible for installing FGD systems on three of Bao's sinters (including at a subsidiary). The executive had never heard of RINO. Moreover, the technical opinion from a Bao engineer that the International Financial Research & Analysis Group provided (in *RINO's Gross Margins are Improbable Relative to the Rest of the Industry – Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading,*) states that Bao never engaged RINO, nor would Bao consider using RINO's CFB technology.

*     *     *

RINO's Disclosures of the Value Added Tax ("VAT") it Pays Greatly Contradict its Reported Revenues.

The inconsistency between VAT and reported revenues highlights the accounting strains resulting from significantly cooking the books. It may also disguise cash leakage from the Company. RINO discloses in the notes to its financial statements the VAT it supposedly paid. The VAT it pays implies that RINO revenues are significantly *greater* than what it actually reports. However, the body of evidence does not suggest that RINO's reporting is conservative. Rather, RINO is overstating revenue. In the PRC, almost all sales of goods are subject to VAT. As RINO explains, it pays VAT of 17% on its sales. By dividing the VAT amounts from the notes by 17%, we arrived at the implied sales numbers. The implied sales are significantly greater than reported sales quarter after quarter.

*     *     *

No Income Tax in 2008 and 2009? Something's Cooking

As we detail on the next page, RINO's SEC filings showing that it had no income tax expense in 2008 and 2009 cannot be correct. (RINO should have paid income taxes of at least 15% in 2008 and 2009.) We cannot comment on the exact implications of RINO's misstatement. In a general sense though, RINO is committing a complicated accounting fraud with a lot of moving parts. When the difference between reality and reported numbers is great, it is easy to make mistakes. Claiming zero income taxes in 2008 and 2009 is one such mistake. RINO has had four CFOs in three years, which increases the challenge of committing the fraud.

*     *     *

The Amount of "Paper" Assets on RINO's Balance Sheet is Implausible for its Business.

For RINO, the problem with balance sheets is that they need to balance. As RINO manufactures profits that inflate the equity side of its balance sheet, it needs to show corresponding increases in assets. In China, determined companies are able to find ways of making fraudulent invoices, sales contracts, receipts, etc. relatively easily. Buying forged paper is obviously less costly than investing in tangible assets. Auditors vary in their diligence in confirming the authenticity of the aforementioned documents. There is an ongoing shareholder lawsuit against RINO's current auditor, Frazer Frost LLP (formerly known as Moore, Stephens Wurth Frazer and Torbet, LLP), regarding accounting fraud with another Chinese company. Frazer Frost also failed to detect a material amount of unauthorized loans taken by the management of China Natural Gas, Inc (CHNG), despite the auditor having

previously stated in CHNG's Form 10-K that CHNG had successfully implemented effective internal controls.

(Internal footnotes and citations omitted.)

55.   Upon the release of the Muddy Waters Report, shares of the Company's stock declined $2.34 per share, or over 15 percent, to close on November 10, 2010 at $13.18 per share, on unusually heavy trading volume.

**Improper Related Party Transactions Between RINO
and Zou and Qiu's Company, Dalian Rino**

56.   In gross breach of their fiduciary duties, the Director Defendants wrongfully caused and allowed the Company to engage in multiple self-dealing transactions with defendants Zou and Qiu and their 100%-owned company, Dalian Rino, to benefit Zou and Qiu at the expense of the Company and its minority shareholders.  Specifically, as detailed in the Muddy Waters Report, the Director Defendants wrongfully caused and allowed (i) approximately $120 million in fees owed by Dalian Rino to RINO pursuant to an "Entrusted Management Agreement" to go unpaid, which, in connection therewith, was simply eliminated as an amount payable on the Company's books; and (ii) RINO, through its subsidiary, Dalian Innomind, to improperly loan approximately $40 million to Dailian Rino (collectively, the "Dalian Rino Transactions").

57.   RINO's Form 10-K filed with the SEC on March 31, 2010 (the "2010 Form 10-K"), the Company explains the structure of RINO and its subsidiaries as well as its relationship with Zou and Qiu's Dalian Rino, s follows:



58.    Dalian Innomind, a subsidiary of RINO, through its contractual arrangements with Dalian Rino, engages in design, development, manufacture and installation of industrial equipment used mainly for environmental protection purposes in the PRC.  Dalian Rino is wholly owned by defendants Zou (90%) and Qiu (10%).  According to the 2010 Form 10-K, pursuant to an Entrusted Management Agreement between Dalian Innomind and Dalian Rino, dated October 3, 2007, Dalian Rino and its shareholders agreed to entrust the operations and management of the business to Dalian Innomind and, in exchange, Dalian Innomind is entitled to Dalian Rino's net profit as an entrusted management fee.   Simply put, Dalian Innomind (owned by RINO) is to provide management services to Dalian Rino (owned by defendants Zou and Qiu) in return for 100% of

Dalian Rino's pre-tax income. Despite this agreement, as explained in the Muddy Waters Report, Dalian Rino (*i.e.*, Zou and Qiu) failed to pay hundreds of millions of dollars in management fees to the Company, and the Individual Defendants caused the Company to simply write it off:

> **RINO's Founders Have Failed to Transfer Income to the Company, and to Let the Company Operate out of the Facilities it Supposedly Leases. What do RINO Shareholders Actually Own? (About $2.45 per Share and Falling)**
>
> Excluding the funds raised in December 2009 and possibly assets acquired for the Changxing Island project, RINO's shareholders own little to no productive assets and have received no benefit from the profits VIE purportedly generates. ***RINO's founders have failed to transfer $120 million in pretax income to the Company.*** At the same time, the Company is supposed to be leasing production facilities from the founders' company so that the Company can generate its own revenue. The founders' company however continues to generate substantially all business. Accounting fraud issues aside, it appears that RINO shareholders own far less of value than they had assumed.
>
> RINO's operating company did not go public directly. Instead, RINO has an indirect form of ownership in the operating company. RINO owns a PRC company ("Innomind") that has a series of contracts with the operating company. The operating company is a Variable Interest Entity ("VIE").
>
> *    *    *
>
> When RINO went public via reverse merger in October 2007, VIE had been carrying out all operations. Innomind only came into existence in July 2007 in preparation for the reverse merger transaction. On October 3, 2007, Innomind entered into a series of contracts that were designed to transfer all of the benefits of owning VIE to Innomind without actually transferring ownership. Under the agreements, VIE and its owners (Mr. Zou and Ms. Qiu) agreed to:
>
> - Sell to Innomind substantially all of VIE's manufacturing equipment and tangible assets for RMB 2,250,343;
>
> - Lease to Innomind substantially all of RINO's manufacturing plant and land at an annual rent of RMB 612,000; and
>
> - Pay to Innomind on a monthly basis whatever pretax profit VIE generates.
>
> Despite selling and leasing all of these assets to Innomind, Mr. Zou and Ms. Qiu's company, VIE, is still carrying out all of RINO's operations. And it has not made any management fee payments to Innomind. Thus, excluding the funds raised in December 2009 and possibly assets acquired for the Chang Xing Island project with such funds, RINO's shareholders own little to no productive assets and have received no benefit from the profits VIE purportedly generates.
>
> The table below shows the VIE account balances. In order to determine the amounts in the rest of the company ("ROC"), we subtracted the VIE balances from those in the consolidated balance sheet. We have highlighted the key operating accounts in yellow.

Note also the VIE account in red font, the Payable to Rino International to be eliminated of $156.5 million.

## VIE / Rest of Company
## Balance Sheet as of June 30, 2010

| | VIE | Rest of Company | Consolidated |
|---|---|---|---|
| Current assets | 169,064,701 | 99,828,809 | 268,893,510 |
| Plant and equipment | 11,048,140 | 1,972,696 | 13,020,836 |
| Other non current assets | 22,301,543 | (3,340,998) | 18,960,545 |
| Total assets | 202,414,384 | 98,460,507 | 300,874,891 |
| AP | 7,019,623 | 182,569 | 7,202,192 |
| ST loan | 3,682,500 | - | 3,682,500 |
| Payable to Rino International to be eliminated | 156,541,384 | N/A | N/A |
| Billing in excess of costs & earnings | 3,385,163 | - | 3,385,163 |
| Customer deposits | 351,630 | - | 351,630 |
| Other payable and accrued liabilities | 410,144 | 98,420 | 508,564 |
| Notes payable | 3,241,092 | 147,300 | 3,388,392 |
| Due to shareholder | 85,523 | 450,372 | 535,895 |
| Deferred revenue | 1,333,127 | - | 1,333,127 |
| Tax payable | 407,395 | 2,854,404 | 3,261,799 |
| LT loan | 8,101,500 | - | 8,101,500 |
| Total liabilities | 184,559,081 | 3,733,065 | 31,750,762 |

The current asset balance for ROC should largely consist of cash RINO raised on December 7, 2009. (It raised a gross amount of $100 million.) The preponderance of operating liabilities in VIE shows that VIE continues to carry on almost all of RINO's operations.

The most problematic account is the $156.5 million Payable to Rino International to be eliminated. RINO's reported cumulative pretax income from September 30, 2007 onward is $120.0 million. This payable shows that VIE never made the required payments under the Entrusted Management Agreement. Refer to *RINO's SAIC Financial Statements Show 2009 Revenue of $11 million* in which we show the 2009 SAIC income statement for Innomind, which shows no 2009 revenue. Had Innomind received the 2009 management fees, it would have booked them as revenue.

***There are two reasons why VIE has never made these payments. The first is that the money simply is not there. As this report shows, RINO has significantly inflated its revenue and profits. The second reason is that to the extent VIE is profitable, Mr. Zou and Ms. Qiu want to keep the profits in the company of which they own 100%, rather than sharing with the shareholders.***

(Emphasis added. Internal references omitted.)

59.     As controlling shareholders of RINO, defendants Zou and Qiu stood on both sides of the failure to pay the management fees owed by Dalian Rino and subsequent write-off of such fees by the Company, which resulted $120 million being retained by Zou and Qiu that properly belonged to the Company.

60.     In fact, the Director Defendants knew that Zou and Qiu were materially conflicted with respect to Dalian Rino and would act in their own interests and against the best interests of the Company and its shareholders.  For example, the 2010 Form 10-K states:

> The terms of the Restructuring Agreements were negotiated between Dalian Rino and the investors in the private placement that we completed on October 5, 2007 on behalf of the Company at an arms-length, the approval of which by the Company was a condition precedent to closing of the private placement. However, there may be potential conflicts of interest in the performance and enforcement of the Restructuring Agreements because our CEO and director, Mr. Zou, who, together with his wife, are the sole beneficiaries of The Innomind Trust which 100% of Dalian Rino's equity interest. ***As such, we can not assure you that Mr. Zou, in his capacity as our CEO and director, will act in the best interest of the Company when a conflict between us and Dalian Rino arises because of his ownership interest in Dalian Rino. For example, if Dalian Rino violates the Restructuring Agreement because of its failure to pay any management fee to Dalian Innomind, the fact that Mr. Zou has a 90% ownership interest in Dalian Rino may affect his decision as to whether and/or how vigorously the Company will seek to enforce its rights under the Restructuring Agreements.*** (Emphasis added.)

61.     Even more egregiously, the Muddy Waters Report further disclosed that not only did the Director Defendants fail to ensure that RINO received the management fee payments from Dalian Rino to which it was entitled, but that RINO, via its subsidiary Dalian Innomind, had improperly loaned approximately $40 million to Dalian Rino.  The Muddy Waters Report stated:

> **Even Worse, Innomind Appears to Have Provided VIE $35 - $40 million of Shareholders' Money. Because We are Skeptical of Much of the "Paper" in RINO's Balance Sheet, These Funds Could Have Been Misappropriated.**
>
> ***Because RINO does not own VIE, it has agreements with VIE designed to transfer money and value to RINO. Beyond not honoring those agreements, the management is causing money to flow the wrong way – into VIE. Innomind is lending money to VIE, which is highly improper and alarming because it would mean that VIE is actually taking money directly from RINO's shareholders.*** Approximately $40 million in raised funds have been paid into Innomind, yet according to SAIC financials, Innomind is nearly devoid of cash or any tangible assets. Clearly, were VIE sitting on $120.0 million it owes Innomind, it would not need to pull $35 - $40 million more out of Innomind.
>
> The $36.5 million difference between the payable and the cumulative pretax income (discussed in the prior section) is likely due to VIE borrowing money from Innomind.

The SAIC balance sheets we obtained through a reputable credit bureau show VIE's Other Accounts Payable approximate Innomind's Accounts Receivable plus Other Accounts Receivable. As of December 31, 2009, the approximate amount of these totals is $40 million. ***Given the $36.5 million difference between US GAAP cumulative pretax income and VIE's payable to Rino International, it is clear that roughly $35 million to $40 million has improperly flowed from Innomind to VIE.***

The money that went into Innomind came directly from RINO's equity raises. Innomind was originally incorporated with $20 million in paid-in-capital,20 which RINO paid in following its $21.3 million (net) raise in October 2007. Almost all of the money paid in had become receivables by December 31, 2008. In late 2009, Innomind applied to increase its capital to $80 million; and, has contributed a total of $40 million to date. (The additional $20 million would have had to come from the December 2009 equity raise. By law, VIE would not have been able to contribute equity capital to Innomind.) Note below that Innomind ended the year with $40.7 million in receivables. The December 2009 raise funded the increase in Innomind's receivables.

[CONTINUES ON FOLLOWING PAGE]

| SAIC Balance Sheets USD (000's) | | | | |
|---|---|---|---|---|
| | VIE | | Innomind | |
| | 12/31/08 | 12/31/09 | 12/31/08 | 12/31/09 |
| Cash | 1,669 | 9,329 | 142 | 873 |
| Notes Receivable | 397 | 439 | - | - |
| Inventory | 1,186 | 6,675 | 41 | 218 |
| Accounts Receivable | 10,531 | 9,334 | 5,357 | 5,357 |
| Advances to Suppliers | 11,531 | 9,479 | - | - |
| Other Accounts Receivable | 1,783 | 2,277 | 16,952 | 35,356 |
| Other Current Assets | 1 | - | 7 | 7 |
| Current Assets | 27,100 | 37,533 | 22,499 | 41,811 |
| Fixed Assets, net | 10,020 | 10,514 | 1,034 | 840 |
| Projects Under Construction | 1,764 | 1,764 | - | - |
| Long-term Investments | 293 | 293 | - | - |
| Intangible Assets | 1,053 | 1,354 | 22 | 16 |
| Long-term Deferred Expenses | 32 | 158 | - | - |
| Other Assets | - | - | - | - |
| Total Assets | 40,262 | 51,616 | 23,555 | 42,668 |
| Short-term Loans | 8,785 | 1,464 | - | - |
| Accounts Payable | 312 | 1,881 | - | - |
| Advances from Customers | 1,322 | 7 | - | - |
| Accrued Wages | 82 | 107 | - | - |
| Taxes Payable | (85) | 275 | - | (1) |
| Other Accounts Payable | 22,344 | 40,697 | 110 | 86 |
| Other Current Liabilities | - | - | 35 | 7 |
| Current Liabilities | 32,760 | 44,432 | 145 | 92 |
| Long-term Liabilities | - | - | - | - |
| Shareholders' Equity | 7,502 | 7,184 | 23,410 | 42,575 |
| Total Liabilities & Equity | 40,262 | 51,616 | 23,555 | 42,668 |

(Emphasis added.  Internal references omitted.)

62.     As controlling shareholders of RINO, defendants Zou and Qiu stood on both sides of the improper $40 million loan to Dalian Rino.

63.     The Director Defendants breached their fiduciary duties by allowing the management fees owed by Dalian Rino to the Company to go unpaid and by causing the Company to improperly loan $40 million to Dalian Rino, in order to benefit Zou and Qiu at the expense of RINO and its shareholders.   The other Director Defendants failed to act independently of defendants Zou and Qiu and knowingly and deliberately allowed them to pursue the foregoing improper self-dealing transactions.

64.     Because RINO's controlling shareholders stood on both sides of the Dalian Rino Transactions, each of the Dalian Rino Transactions is subject to the "entire fairness" standard.  The Director Defendants cannot possibly meet this standard because they cannot prove that the terms of the Dalian Rino Transactions and the process by which such transactions were proposed, negotiated and entered into were fair to RINO.   To the contrary, both of the Dalian Rino Transactions were manifestly unfair to RINO.

65.     Upon information and belief, none of the Director Defendants formed an independent committee to evaluate and negotiate the terms of the Dalian Rino Transactions, retained any independent legal counsel or financial advisor to advise them in connection therewith, received any "fairness opinion" regarding the Dalian Rino Transactions, or considered any alternative transactions or terms.

66.     Accordingly, the processes by which the Dalian Rino Transactions were approved and the terms on which they were entered into were unfair to the Company and in breach of the Director Defendants' fiduciary duties.

### The $3.5 Million Loan to Qiu and Zou in Violation of Sarbanes-Oxley

67.     Finally, the Muddy Waters Report also discussed a $3.5 million "unsecured and interest free" loan that RINO gave to defendants Zou and Qiu so that they could purchase a residence in Orange County, California.  In this regard, the Muddy Waters Report stated:

> **While immaterial compared to their other sins, RINO management's "borrowing" $3.5 million to purchase a luxury home in Orange County gives**

**insight to their character, as well as a window into the dynamics between management, RINO's independent directors, and the Company's auditor.**

Mr. Zou and Ms. Qiu borrowed "approximately $3.5 million" on December 7, 2009. This is the same day that RINO closed its $100.0 million financing.  Two days later the couple bought a luxury home in Orange County, CA assessed at $3.2 million. (The couple currently has it on the market for $4.0 million: http://www.redfin.com/CA/Coto-De-Caza/31232-Via-Colinas-92679/home/50 54824)  RINO disclosed the "loan" for the first time in its 2009 Form 10-K, filed on March 31, 2010. The home purchase is less well known.

Some have publicly stated that the couple took the loan out of naïveté about the complicated restrictions of being a public company.  We doubt that.  *Based on the timeline of events and haphazard means of accounting for this loan, we wonder whether the couple volunteered that they had taken this money; or, whether the auditor uncovered it just before the filing deadline.*

*If the latter, it begs questions of whether involved parties met their fiduciary duties.*  Further to that, the manner in which the home was used to secure the loan presents questions.  Finally, RINO claimed that the couple repaid the loan by May 10, 2010; however, the home title was not re-granted to the couple by RINO until sometime between May 28, 2010 and August 18, 2010.

*We doubt that the couple was unaware it was improper to borrow / take money from RINO.*  PRC Company Law article 149 clearly prohibits this action.  Might they have been unaware of this prohibition?  We find that unlikely – stories of minority shareholders getting screwed by management borrowing / taking money from their companies abound in China's newspapers and business circles.  *We are comfortable that they understood their duty not to take money from the company. They just didn't care.*

The couple transferred ownership of the home to RINO International Corp. as security for the loan on March 22nd, 2010.  This was just before the filing deadline, and makes us think that because they could have transferred it in the three and one-half months prior, it was part of a rushed process.  We therefore infer that the loan was first disclosed / discovered just prior to the home transfer.

The inconsistent manner in which the loan is discussed and accounted for in the Form 10- K adds to our belief that the disclosure / discovery was shortly before the filing deadline.

The notes to the 10-K state that Zou and Qiu borrowed "approximately" $3.5 million, and had repaid $300,000 by the time of filing.  However, the balance sheet netted the $3.5 million against $494,614 RINO owed to the couple as of December 31, 2009, showing a "due from shareholders" balance of $3,005,386.  On the other hand, the cash flow statement shows that during 2009, RINO made a "payment to shareholder" of $5,093,486, while showing "proceeds from shareholder" of $1,532,372, which produces a net amount of $3,561,114.  These inconsistencies indicate that there was a rushed effort to account for the funds.

*If the disclosure / discovery came over three months after the money had been taken, a key question is whether the independent directors believed that taking the money was a mistake made in good faith.*  We may never know the answer, but the manner in which the couple secured the loan is unusual. Rather than RINO merely recording a lien on the home, the couple actually transferred it by grant deed

1

2

(without consideration) to RINO.  We wonder whether the transfer was viewed as a way to mitigate the risk that the couple would sell the home before repaying the loan.

3

4

5

6

7

8

Another peculiarity in the series of events is that RINO claimed the couple repaid the loan on May 10, 2010; however, RINO did not return full ownership of the home to them until later – and how much later is unclear.  The couple executed a loan agreement with RINO on March 31, 2010 in which they agreed to repay the loan in full on or by May 10, 2010. RINO agreed to return the home within three business days of receiving repayment. RINO's 10-Q states that the couple did in fact repay the loan by this date.  However, on May 14, 2010, RINO executed a deed of trust with the couple, which means they mortgaged the home (with RINO as the lender).  Oddly, the deed of trust states that the loan amount is $3,500 (three thousand five hundred dollars).  If they had repaid the loan at that point, why did RINO refrain from outright granting the home back to them?

9

10

11

On August 18, 2010, the couple recorded a grant deed that returned unencumbered ownership of the home to them.  The conveyance to them was notarized on July 16, 2010, but the date on the deed is May 28, 2010.  These differing dates again make us wonder whether the loan was actually repaid when RINO claims it was.

12

13

As we wrote, the amount of money involved in the home transaction is relatively immaterial, but we wonder whether shareholders were denied an earlier opportunity to gain a better understanding of the people running RINO.

14

(Emphasis added.  Internal references omitted.)

15

16

17

18

68.     The deed transfers described in the Muddy Waters Report are confirmed by the public documents on file with the Office of the Clerk of Orange County, California.   Upon information and belief, the statement in the Company's May 14, 2010 10-Q that the loan was "repaid" was false, and even if it was "repaid," it was "repaid" using additional Company funds that Zou and Qiu had misappropriated from the Company.

19

20

21

69.     Section 402 of Sarbanes-Oxley prohibits publicly-traded corporations from extending, arranging, or renewing personal loans to or for directors and executive officers or the equivalent thereof.  Specifically, it provides that:

22

23

24

It shall be unlawful for any issuer… directly or indirectly, including through any subsidiary, to extend or maintain credit, to arrange for the extension of credit, or to renew an extension of credit, in the form of a personal loan to or for any director or executive officer (or equivalent thereof) of that issuer.

25

15 U.S.C. § 78m(k)(1).

26

27

28

70.     Defendants Zou and Qiu were both directors and executive officers of the Company at the time the $3.5 million loan was made.  Accordingly, the loan, and the subsequent entry into the loan agreement, constituted a violation of Sarbanes-Oxley, as well as further breaches of the

Individual Defendants' fiduciary duties owed to the Company and its shareholders and a waste of corporate assets.

71.     The purchase of one house using Company assets was apparently not enough for Zou and Qiu.  Upon information and belief, Zou and Qiu brazenly used Company assets to purchase another residential property in Orange County, California.  The two properties are located at 6 Palma Valley, Trabuco Canyon, California and 31232 Via Collinas, Coto de Caza, California (collectively, the "California Houses").

72.     Upon information and belief, in late October or early November 2012, the California Houses were sold for a total purchase price of approximately $5.9 million.  Approximately $3,535,000 of the $5.9 million was used to fund a settlement in a securities class action filed against the Company and certain of the Individual Defendants.  Upon information and belief, defendants Zou and Qiu remain in possession of the excess proceeds from the sale of the California Houses, approximately $2,365,000.

## The Truth Begins to Emerge

73.     On November 11, 2010, the Company announced that it had commenced an internal review of the issues detailed in the Muddy Waters Report.  RINO also stated that it would provide investors "with a timely and detailed response to the allegations upon completion of its internal review."  On this news, the Company's shares declined an additional $2.08 per share, or over 15 percent, to close that day at $11.10 per share, again on unusually heavy trading volume.

74.     On November 15, 2010, the Company announced its third quarter 2010 financial results.  The Company reported earnings that missed analysts' estimates for the quarter, and lowered its full year sales forecast from its previously estimated range of between $221 million and $229 million down to between $203 million and $211 million – also less than the average analyst estimate.

75.     Also on November 15, 2010, citing allegations of fraud and RINO's initiation of its internal review, an analyst at Canaccord Genuity cut its rating of RINO to "Sell."

76.     On this news, shares of RINO declined $3.46 per share, or over 31 percent, to close on November 15, 2010 at $7.55 per share, on unusually heavy trading volume.

77.    On November 17, 2010, the Company cancelled its third quarter conference call. Thereafter, shares of RINO declined an additional $1.48 per share, or over 19 percent, before trading in the Company's shares was halted intraday "pending further news from the company."

78.    On November 19, 2010, the Company filed with the SEC a Form 8-K, which in relevant part stated:

> On November 17, 2010 Frazer Frost, LLP, the independent auditors of RINO International Corporation (the "Registrant"), delivered a letter (the "Auditor's Letter") to the Registrant and each of its directors. The Auditor's Letter states in part:

> "In a telephone conversation on November 16, 2010, Mr. Zou Dejun the Chief Executive Officer of the Company, informed Ms. Susan Woo of our firm, in substance, that *as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable. When Ms. Woo inquired about the Company's other contracts, Mr. Zou said he was not sure, but there might be problems with 20 - 40% of them. Assuming that these statements were reasonably accurate, it appears that our reports would have been affected if this information had been known to us at the date of our reports, although the effect on the financial statements is currently unknown and cannot be quantified without a thorough investigation.* We further note that in a conversation the following day, November 17, 2010, involving Ms. Woo, several directors of the Company, Company counsel, and Mr. Zou, Mr. Zou stated that he was not sure the day before and went back to look into some things, and found that apart from the two problematic contracts, all other contracts are legitimate and can be verified.

> The auditing standards of the Public Company Accounting Oversight Board provide procedures to be followed by an auditor to prevent continued reliance on audit reports in such circumstances. *In view of the information provided by Mr. Zou Dejun, we hereby advise the Company to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."*

> On November 17, 2010 certain members of the Board of Directors, including Kennith Johnson, the Chairman of the Audit Committee, Jianping Qiu, the Chairman of the Board of Directors, and Mr. Zou Dejun participated in a conference call with Ms. Susan Woo, a partner of Frazer Frost, LLP in which the foregoing statements were discussed. The two other members of the Board were not available because they were traveling and therefore the Board of Directors could not take any formal action regarding the matters discussed in the Auditor's Letter. The Registrant intends to have a telephonic meeting of the Board of Directors to further discuss such matters and related matters as soon as all of the members of the Board of Directors are available.

(Emphasis added.)

79.     Also on November 19, 2010, the Company filed with the SEC a second Form 8-K,

which in relevant part stated:

On November 18, 2010, *the Board of Directors (the "Board") of RINO
International Corporation (the "Registrant") a Nevada corporation, concluded
that previously issued audited financial statements of the Registrant for its fiscal
years ended December 31, 2008 and 2009, which were included in the
Registrant's Annual Reports on Form 10-K for the fiscal years ended December
31, 2008 and 2009, and previously issued interim unaudited financial statements
which were included in the Registrant's Quarterly Reports on Form 10-Q for the
periods ended March 31, 2008 to September 30, 2009 should no longer be relied
on.*[5]   The Board also concluded that previously issued interim unaudited financial
statements which were included in the Registrant's Quarterly Reports on Form 10-Q
for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no
longer be relied on inasmuch as such financial statements incorporate results from
2008 and 2009.

The conclusion of the Board that the financial statements for the above-described
periods should not be relied upon was based on statements made by the Registrant's
Chief Executive Officer, Mr. Zou Dejun, after consultation with the Registrant's
Chief Accountant, who reported to the Board that the Registrant did not enter into
two contracts for which it reported revenue during the Registrant's 2008 and 2009
fiscal years.

Three of the Registrant's Board members, including the Chairman of its Audit
Committee and Chief Executive Officer, discussed the foregoing matters with the
Registrant's independent accountant on November 16 and 17, 2010.

The Registrant's Board has authorized its Audit Committee to take all steps
necessary to investigate the matters set forth above and other allegations of
misstatements, and address any deficiencies found, including authorization to
engage an outside law firm to conduct an independent investigation with the
assistance of such other professionals as it may require.

(Emphasis added.)

80.     On December 2, 2010, RINO issued a press release entitled "RINO International

Corporation Common Stock to be Delisted by NASDAQ Stock Market."  The press release stated:

RINO International Corporation (the "Company")(Nasdaq: RINO) announced today
that it has received a letter from The NASDAQ Stock Market ("NASDAQ") stating
that based upon its review of the Company and pursuant to NASDAQ Listing Rules
5101, 5250(a)(1) and 5250(c)(1), the staff of NASDAQ believes that the continued
listing of the Company's securities on NASDAQ is no longer warranted
(the "NASDAQ Letter").  NASDAQ stated that its staff's determination was based
upon the following:

---

[5] "The Board meeting was held with three of the five sitting members as the other two were
unavailable.  It is anticipated that the other two members will execute waivers of notice of the
meeting as the meeting was held without the requisite notice due to the urgency of the matters
considered."  (Footnote in original.)

**1.** *The Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;*

**2.** *The Company's admission that it had not entered into certain previously disclosed contracts; and*

3. The Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters, LLC report.

The NASDAQ Letter stated that the statement by the Company's independent auditors that their audit reports for 2008 and 2009 can no longer be relied upon constitutes a violation by the Company of NASDAQ Listing Rule 5250(c)(1). The letter also states that the Company's failure to respond to a letter from the NASDAQ staff dated November 17, 2010 constitutes a violation of NASDAQ Listing Rule 5250(a).

The NASDAQ Letter further notified the Company that unless the Company requests an appeal of the NASDAQ staff's determination, trading of the Company's common stock will be suspended at the opening of business on December 8, 2010 and a Form 25-NSE will be filed by NASDAQ with the SEC, which will remove the Company's securities from listing and registration on NASDAQ.

The Company does not intend to appeal the NASDAQ staff's determination to delist the Company's common stock. Pending the delisting of the Company's common stock, which is expected to occur on December 8, 2010, the suspension of trading in the Company's common stock, which commenced on November 17, 2010, remains in effect.

The Company currently intends to re-apply for a listing of its common stock on NASDAQ at an appropriate time after the completion of an independent investigation to be conducted by the Audit Committee of the Company's Board of Directors of the allegations contained in a research report issued by Muddy Waters, LLC, the filing of restated financial statements of the Company for its fiscal years ended December 31, 2008 and 2009 and for the quarterly periods included in the Company's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2010 and the Company's satisfaction of all other listing criteria.

(Emphasis added.)

81. Also on December 2, 2010, the Company filed a Form 8-K, which, in addition to repeating the information contained in the above press release, disclosed:

The Company has been notified by the Staff of the Securities and Exchange Commission (the "SEC") that it is conducting a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present. The Company is cooperating with the SEC's investigation. It is not possible to predict the outcome of the investigation, including whether or when any proceedings might be initiated, when these matters may be resolved or what if any penalties or other remedies may be imposed.

82.     Finally, on December 8, 2010, RINO's shares resumed trading, after having been halted for three weeks.  By the end of the day, the Company's shares had declined an additional $2.92 per share, or over 48 percent, to close at $3.15 per share, on heavy trading volume.

83.     On April 11, 2011, the SEC issued an order temporarily suspending trading of RINO stock.  The SEC's order stated that:

> It appears that there is a lack of current and accurate information concerning the securities of RINO [], because the Company has failed to disclose that (i) the outside law firm and forensic accountants hired by the audit committee to investigate allegations of financial fraud at the company resigned on or about March 31, 2011, after reporting the results of their investigation to management and the board; (ii) the chairman of the audit committee resigned on March 31, 2011; and (iii) the company's remaining independent directors have also resigned.  Further, questions have arisen regarding, among other things: (i) the size of the company's operations and number of employees; (ii) the existence of certain material customer contracts; and (iii) the existence of two separate and materially different sets of corporate books and accounts.

84.     As a result of the above, RINO's shares have declined from a closing price of $15.52 on November 9, 2010 (the day before the Muddy Waters Report was released) to a closing price of $3.15 per share on December 8, 2010 (the day they resumed trading).  Cumulatively, RINO's shares declined $12.97 per share, or almost 80 percent, during November and December 2010.  The price of the Company's stock has not recovered and currently trades for approximately $0.05 per share on the over-the-counter market.

**The Individual Defendants' False and Misleading Statements**

85.     As the Individual Defendants have admitted, all of the following SEC filings were false and misleading when filed because the Individual Defendants falsely reported RINO's financial results for each reporting period.

86.     On May 15, 2008, RINO reported its first quarter 2008 financial and operational results.  For the quarter, the Company reported net sales of $19 million, quarterly gross profit of $7.7 million, net income of $5 million, and earnings per diluted share of $0.20.

87.     Also on May 15, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal first quarter.  The Company's Form 10-Q reaffirmed the Company's financial results announced on the same day in a press release.  The Company's Form 10-Q also stated that RINO's financial statements were "prepared in accordance with accounting principles generally

accepted in the United States of America," and contained Sarbanes-Oxley required certifications, signed by defendant Zou, who certified:

1. I have reviewed this report on Form 10-Q of RINO International Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*       *       *

[Defendant Zou] hereby certifies, in his capacity as an officer of RINO International Corporation (the "Company"), for the purposes of 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:

(1)   The Quarterly Report of the Company on Form 10-Q for the quarter ended March 31, 2008 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

88.   On August 14, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal second quarter.   The Company's Form 10-Q stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."   The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendant Zou, which were substantially similar to the certifications set forth above.

89.   On August 15, 2008, RINO issued a press release announcing its second quarter 2008 financial results.   The quarterly financial results announced in this press release reaffirmed the Company's financial results reported the previous day in RINO's Form 10-Q.   In announcing "record revenue" for the quarter, the Company reported net sales of $34.6 million, quarterly gross profit of $15.3 million, and GAAP net income of $5.4 million, and earnings per diluted share of $0.21.

90.   On November 11, 2008, RINO reported its third quarter 2008 financial results.   In announcing "record revenue" for the quarter, the Company reported net sales of $44.9 million, quarterly gross profit of $20.6 million, GAAP net income of $9.9 million, and earnings per diluted share of $0.39.

91.   On November 12, 2008, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2008 fiscal third quarter.   The Company's Form 10-Q was signed by defendant Zou, and

reaffirmed the Company's financial results announced the previous day in a press release.  The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and contained Sarbanes-Oxley required certifications, signed by defendants Zou and Qiu, which were substantially similar to the certifications set forth above.

92.     On March 31, 2009, RINO filed with the SEC its Annual Report on Form 10-K for the 2008 fiscal year.  The Company's Form 10-K was signed by defendants Zou, Qiu, Weiguo, Xie and Johnson, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America."  The Form 10-K also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Qiu, which were substantially similar to the certifications set forth above.

93.     On April 2, 2009, RINO issued a press release announcing its fourth quarter and fiscal year 2008 financial results.  The quarterly and fiscal year financial results announced in this press release reaffirmed the Company's financial results reported on March 31, 2009 in RINO's Form 10-K.  For the quarter, the Company reported net revenue of $40.8 million, quarterly gross profit of $10.8 million, GAAP net income of $1.0 million, and earnings per diluted share of $0.28.  For fiscal year 2008, the Company reported "record 2008 revenue and net income."  Specifically, the Company reported revenue of $139.3 million (an increase of 119.8 percent), gross profit of $54.3 million (an increase of 78.3 percent), GAAP net income of $21.3 million (an increase of 108.3 percent), and earnings per diluted share of $0.85 (an increase of 63.5 percent).  Additionally, the press release announcing RINO's financial results stated:

| Fiscal Year 2008 Results | | | |
|---|---|---|---|
| | FY 2008 | FY 2007 | CHANGE |
| Sales | $139.3 million | $63.4 million | +119.8 % |
| Gross Profit | $54.3 million | $30.5 million | +78.3 % |
| GAAP Net Income | $21.3 million | $10.2 million | +108.3 % |
| Adjusted Net Income | $38.9 million | $17.7 million | +119.9 % |
| GAAP EPS (Fully Diluted) | $0.85 | $0.52 | +63.5 % |
| Adjusted EPS (Diluted) | $1.55 | $0.90 | +72.2 % |

[Internal footnotes omitted]

*     *     *

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of December 31, 2008 were $19.7 million, representing an increase of 167.1% as compared to $7.4 million as of December 31, 2007, while short term debt stood at $8.8 million compared to none at the end of 2007. Accounts receivable stood at $51.5 million on December 31, 2008 with days sales outstanding of 115 compared to $19.2 million on December 31, 2007 and corresponding days sales outstanding of 102. Inventories and advances for inventory totaled $23.2 million on December 31, 2008. The Company generated $6.0 million in cash flow from operations for 2008, compared with $5.0 million cash used in operations in 2007. Stockholder's equity increased 182.4% to $66.9 million versus $23.7 million in 2007, with the associated book value on December 31, 2008 of approximately $2.67 per share compared to $0.95 in the year ago period.

94.     On May 15, 2009, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2009 fiscal first quarter. The Company's Form 10-Q was signed by defendant Zou, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America." The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Qiu, which were substantially similar to the certifications set forth above.

95.     On May 18, 2009, RINO issued a press release announcing its first quarter 2009 financial results. The quarterly financial results announced in this press release reaffirmed the Company's financial results reported on May 15, 2009 in RINO's Form 10-Q. In announcing "record revenue" for the quarter, the Company reported net revenue of $35.6 million, quarterly gross profit of $16 million, net income of $12.5 million, and earnings per diluted share of $0.50.

96.     On August 10, 2009, RINO announced its second quarter 2009 financial results. For the quarter, the Company reported net sales of $40.7 million, quarterly gross profit of $14.2 million, net income of $9.9 million, and earnings per diluted share of $0.39.

97.     Also on August 10, 2009, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2009 fiscal second quarter. The Company's Form 10-Q was signed by defendants Zou and Liu, and reaffirmed the Company's financial results announced on the same day in a press release. The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and

1  also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Liu, which

2  were substantially similar to the certifications set forth above.

3        98.    On November 13, 2009, RINO announced "record third quarter 2009 financial

4  results." For the quarter, the Company reported net revenue of $63.3 million, quarterly gross profit

5  of $26.1 million, GAAP net income of $17.1 million, and earnings per diluted share of $0.68.

6        99.    Also on November 13, 2009, RINO filed with the SEC its Quarterly Report on Form

7  10-Q for the 2009 fiscal third quarter. The Company's Form 10-Q was signed by defendant Zou,

8  and reaffirmed the Company's financial results announced on the same day in a press release. The

9  Form 10-K stated that RINO's financial statements were prepared "in accordance with accounting

10 principles generally accepted in the United States," and also contained Sarbanes-Oxley required

11 certifications, signed by defendants Zou and Liu, which were substantially similar to the

12 certifications set forth above.

13      100.    On March 31, 2010, RINO reported its fourth quarter and fiscal year 2009 financial

14 results. For the quarter, the Company reported net revenue of $53 million, quarterly gross profit of

15 $16.1 million, GAAP net income of $17.2 million, and earnings per diluted share of $0.68. For

16 fiscal year 2009, the Company reported revenue of $192.6 million (an increase of 119.8 percent),

17 gross profit of $72.3 million (an increase of 33.1 percent), GAAP net income of $56.4 million (an

18 increase of 165 percent), and earnings per diluted share of $2.22. Additionally, the press release

19 announcing RINO's financial results stated:

20

21

22

23

24

| Fiscal Year 2009 Results | | | |
|---|---|---|---|
| | FY 2009 | FY 2008 | CHANGE |
| Sales | $192.6 million | $139.3 million | +27.7% |
| Gross Profit | $72.3 million | $54.3 million | +33.1% |
| GAAP Net Income | $56.4 million | $21.3 million | +164.8% |
| Adjusted Net Income | $57.3 million | $38.9 million | +47.3% |
| GAAP EPS (Fully Diluted) | $2.22 | $0.85 | +161.2% |
| Adjusted EPS (Diluted) | $2.26 | $1.55 | +45.8% |

25     (Internal footnotes omitted)

26                        *      *      *

27

28

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of December 31, 2009 were $134.5 million, as compared to $19.7 million on December 31, 2008, mainly resulting from the $100 million registered direct offering closed on December 7, 2009. Accounts receivable stood at $57.8 million as of December 31, 2009, compared to $51.5 million reported on December 31, 2008. Days sales outstanding were 110 and 135 for 2009 and 2008, respectively. Inventories and advances for inventory totaled $39.4 million on December 31, 2009, while advances for equipment and construction material purchase were $9.1 million. The Company generated $30.9 million in cash flow from operations, compared with $6.0 million cash generated in operation in 2008. Stockholder's equity increased 205.2% to $204.2 million vs. $66.9 million in 2008, with the associated book value on December 31, 2009 of approximately $8.04 per share.

101.    Also on March 31, 2010, RINO filed with the SEC its Annual Report on Form 10-K for the 2009 fiscal year.  The Company's Form 10-K was signed by defendants Zou, Liu and Li, and reaffirmed the Company's financial results announced on the same day in a press release.  The Form 10-K stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Liu, which were substantially similar to the certifications set forth above.

102.    The Company's 2010 Form 10-K was also the first disclosure that defendants Zou and Qiu had received a $3.5 million "unsecured and interest free" loan from the Company in order to purchase a residence in Orange County, California.  Notably, although the Company had previously filed a Form 8-K Current Report and issued a press release on December 7, 2009 to disclose that it had completed an equity offering with several institutional investors, wherein RINO disclosed that it had completed an equity offering worth approximately $100 million (as well as sold warrants exercisable for common shares worth up to an additional approximate $78.5 million), Defendants failed to disclose that, *on this very same day*, RINO had provided defendants Zou and Qiu with this loan, which, as stated above, violated Sarbanes-Oxley.  As belatedly disclosed in RINO's Form 10-K, filed on March 31, 2010:

On December 7, 2009, the Company made a loan of $3,500,000 to Mr. Dejun Zou and Ms. Jianping Qiu on an unsecured and interest free basis. Mr. Zou and Ms. Qiu are directors and officers of the Company. The loan is short term in nature and to be repaid in the form of cash on or before May 10, 2010.

As further detailed by the Company in its March 31, 2010 Form 10-K, "On March 22, 2010, Mr. Zou and Mrs. Qiu transferred their personal property as a security of the loan borrowed from the Company."

103. The Company's 2010 Form 10-K also disclosed that while the Individual Defendants were in possession of material non-public information regarding the Company's false financial statements, on December 7, 2009, the Individual Defendants caused the Company to undergo a secondary public offering whereby the Individual Defendants diverted approximately $91 million to Zou and Qiu.

104. On May 14, 2010, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2010 fiscal first quarter. The Company's Form 10-Q was signed by defendants Zou and Wang, and stated that RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America." The Form 10-Q also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Wang, which were substantially similar to the certifications set forth above.

105. On May 17, 2010, RINO reported its first quarter 2010 financial results. The quarterly financial results announced in this press release reaffirmed the Company's financial results reported on May 14, 2010 in RINO's Form 10-Q. For the quarter, the Company reported net revenue of $47.9 million, quarterly gross profit of $16.7 million, GAAP net income of $18.7 million, and GAAP earnings per diluted share of $0.65. Additionally, the press release announcing RINO's financial results stated:

> "During the first quarter of 2010, we delivered measured revenue growth through the execution of several major projects, including both desulphurization and wastewater treatment systems," commented Mr. Zou Dejun, President and CEO of RINO International. "We are pleased with the momentum in our business as evidenced by our backlog and expect a robust second half of the year as the State Environmental Protection Agency (SEPA) maintains a supportive policy to reduce the sulphur emissions for iron and steel producers, while aging wastewater infrastructure systems force prospective customers to accelerate purchase decisions. We are confident in meeting our projects for $225 million in revenue for 2010, representing 17% growth over 2009.

> \*     \*     \*

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of March 31, 2010 were $97.7 million, representing a decrease of 27.4% as compared to $134.5 million as of December 31, 2009.  At the end of the quarter the Company had working capital of 231.8 million and a current ratio of 7.1 to 1.  Accounts receivable stood at $52.3 million, a 9.6% decrease from $57.8 million reported as of December 31, 2009.

106.    On August 16, 2010, RINO reported its second quarter 2010 financial results.  For the quarter, the Company reported total revenues of $65.4 million, quarterly gross profit of $23.1 million, net income of $20.4 million, and earnings per diluted share of $0.71.  Additionally, the Company's press release announcing its financial results stated:

**Balance Sheet and Cash Flow Discussion**

Cash and cash equivalents as of June 30, 2010 were $88.0 million, representing a decrease of 34.5% as compared to $134.5 million as of December 31, 2009. At the end of the second quarter, the Company had working capital of $245.2 million and a current ratio of 11 to 1.

*        *        *

**Backlog as of June 30, 2010**

Backlog, defined as projects for which contracts have been signed but which have not been completed or started, as of June 30, 2010 was $104.7 million. The Company expects that approximately 50% of the currently backlogged contracts will be executed and recognized as revenue by the end of the third quarter, 2010.

| Product Segment | Amount ($ millions) |
| --- | --- |
| 1.  Desulphurization Systems | 70.8 |
| 2.  Wastewater Treatment | 14.6 |
| 3.  Anti-oxidation Systems | 0.4 |
| 4.  Municipal Sludge Treatment | 18.9 |
| Total | 104.7 |

107.    Also on August 16, 2010, RINO filed with the SEC its Quarterly Report on Form 10-Q for the 2010 fiscal second quarter.  The Company's Form 10-Q was signed by defendant Zou, and reaffirmed the Company's financial results announced on the same day in a press release.  The Company's Form 10-Q stated that the RINO's financial statements were "prepared in accordance with accounting principles generally accepted in the United States of America," and also contained Sarbanes-Oxley required certifications, signed by defendants Zou and Wang, which were substantially similar to the certifications set forth above.

**The Individual Defendants Cause the Company to Undergo a Secondary Public Offering**

108.   On December 7, 2009, the Individual Defendants while in possession of the foregoing material non-public information regarding the Company's false financial statements, wrongfully caused and allowed RINO to complete an underwritten public offering of its common stock (the "Secondary Offering") against the Company's best interests.   In connection with the Secondary Offering, the 2010 Form 10-K stated:

> On December 7, 2009, the Company closed a public offering of 3,252,032 shares of its common stock; Series A Common Stock Warrants, which are exercisable within six months of the closing date, to purchase up to an aggregate of 1,138,211 shares of Common Stock at an exercise price of $34.50 per Warrant; and Series B Common Stock Warrants, which are exercisable beginning on the six month one day anniversary of the closing day until the one year one day anniversary of the closing date, to purchase up to an aggregate of $1,138,211 shares of Common Stock at an exercise price of $34.50 per Warrant. ***The Company received net proceeds of approximately $94.9 million*** from the offering, after deducting underwriting discounts and estimated offering expenses. The offering was underwritten by Rodman & Renshaw, LLC ("Rodman"), pursuant to the Underwriting Agreement by and between the Company and Rodman dated as of December 2, 2009.

109.   According to the Prospectus filed with the SEC on December 4, 2009 (the "Prospectus"), the Company stated that it "currently intend[s] to use the net proceeds from this offering for working capital requirements."   However, at the time of the Secondary Offering the Individual Defendants knew that the Company was filing false financial statements and knowingly concealed the true status of the Company's financial condition and business prospects from the market.   In breach of their fiduciary duties, the Individual Defendants caused the Company to complete the Secondary Offering solely to benefit defendants Zou and Qiu at the expense of the Company and its shareholders.

**The Individual Defendants' Breaches of Fiduciary Duties**

110.   The Company's pervasive financial reporting improprieties were the direct result of the Individual Defendants' breaches of fiduciary duties.

111.   In breach of their fiduciary duties, the Individual Defendants knowingly disseminated and filed with the SEC and SAIC inaccurate and inconsistent financial statements and other financial filings, as described above.

112.    In particular, the Individual Defendants reported in the Company's SEC and SAIC filings drastically inconsistent financial results, particularly related to the Company's revenues, gross profit and net income.  The discrepancies cannot be attributed to differences between U.S. and Chinese GAAP, nor to any other legitimate accounting matter.   Indeed, the Individual Defendants have admitted that the Company's SEC filings were false and misleading.

113.    The Individual Defendants, from at least 2008 until 2010, prepared and reviewed all financial statements of the Company, held committee meetings and met with management regularly regarding the Company's accounting practices and compliance with applicable regulations.  As such, these defendants knew of the reporting problems but did nothing to rectify or prevent them.   At a minimum, the Individual Defendants knew that there were inexplicable discrepancies between the Company's SAIC and SEC filings and, therefore, that the SAIC-filed financial statements, SEC-filed financial statements, or both sets of financial statements, were materially inaccurate and misleading.   Moreover, the Individual Defendants knew that the Company had not entered into the customer contracts it reported in its SEC filings.  Nevertheless, the Individual Defendants made no effort to ensure that the Company corrected its financial statements or prevented future inaccurate and misleading filings.

114.    First, the Individual Defendants breached their fiduciary duties by knowingly employing improper reporting practices at the Company in violation of applicable U.S. and Chinese regulations and by knowingly disseminating inaccurate and inconsistent financial statements and financial filings resulting therefrom.

115.    Second, the Individual Defendants breached their fiduciary duties by failing to enforce the Entrusted Management Agreement between Dalian Rino and RINO which has resulted in RINO never being paid hundreds of millions of dollars in management fees and by knowingly allowing Dalian Rino to borrow tens of millions of dollars from RINO through its subsidiary Innomind.

116.    Third, the Individual Defendants further breached their fiduciary duties of loyalty and good faith by granting Zou and Qiu an illegal and undisclosed $3.5 million "unsecured and

interest free" loan, which also violated Sarbanes-Oxley, and concealing the existence of the loan for more than four months.

117.    Lastly, the Individual Defendants breached their fiduciary duties of loyalty and good faith by causing and approving the Secondary Offering, which was not, and could not have been, an exercise of good faith business judgment.  Rather, the Secondary Offering was intended to, and did, unduly benefit defendants Zou and Qiu at the expense of the Company.

118.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with RINO's internal investigation of the misconduct, the SEC's investigation of the Company's misconduct, the Secondary Offering and the Company's restatements of its historical financial statements, as well as the loss of market-rate interest in connection with the illegal loan to Zou and Qiu.  Additionally, RINO has been deprived of millions of dollars in required payments under the Entrusted Management Agreement between RINO and Dalian Rino and is owed millions of dollars from Dalian Rino due to improper lending.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

119.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

120.    Plaintiffs are shareholders of RINO, were shareholders of RINO at the time of the wrongdoing alleged herein, and have been shareholders of RINO continuously since that time.

121.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

122.    As a result of the facts set forth herein, Plaintiffs have not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

123.    At the time this action was commenced, the Board consisted of five (5) directors: defendants Zou, Qiu, Johnson and Xie, and non-defendant Li Zejin.  Each of these directors is

incapable of independently and disinterestedly considering a demand to commence and vigorously

prosecute this action, as follows:

a.     Defendants Zou and Qiu, who are husband and wife, are identified by RINO as "non-independent directors" of the Company, and cumulatively control a majority of the Company's common stock;

b.     Defendants Zou and Qiu caused RINO to extend to them a $3.5 million "unsecured and interest free" loan in violation of Sarbanes-Oxley, so that that they could purchase a residence in Orange County, California.  Zou and Qiu stand on both sides of such transaction and are directly interested therein;

c.     Defendants Zou and Qiu who own Dalian Rino and pursuant to the Entrusted Management Agreement between RINO and Dalian Rino, have caused Dalian Rino to fail to pay RINO hundreds of millions of dollars in required management payments and have caused RINO to illegally lend money to Dalian RINO.  Zou and Qiu stand on both sides of such transactions and are directly interested therein;

d.     Defendants Zou and Qiu who are majority shareholders of the Company and reaped the benefits of the illegal Secondary Offering. v stand on both sides of the Secondary Offering and are directly interested therein;

e.     Defendants Zou, Qiu, Johnson and Xie, who in December 2009 caused RINO to make the $3.5 million "unsecured and interest free" loan to Zou and Qiu.  At the time the loan was given to Zou and Qiu, RINO's Board was composed of Zou (co-recipient of the loan), Qiu (co-recipient of the loan), Johnson, Xie, and former director Zhang Weiguo.  Zou, Qiu, Johnson and Xie are four of the five directors that composed RINO's Board as of the commencement of the action. That these directors caused RINO to make this illegal "unsecured and interest free" loan to Zou and Qiu, and then only belatedly disclosed that it was made, demonstrates the Board's utter lack of independence from these two directors, who control the Board and the Company through their positions as majority shareholders and CEO and Chairman of the Board;

f.     In light of their knowledge of and participation in the Company's ongoing improper reporting practices, as alleged in detail herein, defendants Zou, Qiu, Johnson and Xie each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

g.     In light of their knowledge of and participation in the Company's ongoing improper reporting practices, as alleged in detail herein, defendants Zou, Qiu, Johnson and Xie each face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith by approving the Secondary Offering to solely benefit Zou and Qiu and therefore are incapable of disinterestedly and

independently considering a demand to commence and vigorously prosecute this action.

h.    Zou, Qiu, Johnson and Xie each face a substantial likelihood of liability for breaching their fiduciary duties because they had actual knowledge that Dalian RINO has failed to pay hundreds of millions to RINO pursuant to the Entrusted Management Agreement between RINO and Dalian Rino and that RINO was illegally lending money to Dalian Rino, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

i.    Zou, Qiu, Johnson and Xie, as members of the Board, knowingly approved the filing of and signed inaccurate and inconsistent financial statements in violation of U.S. and Chinese reporting regulations and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties.   Accordingly, defendants Zou, Qiu, Johnson and Xie are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

j.    Johnson and Xie, as Audit Committee members, had the responsibility, pursuant to the Audit Committee Charter, for:

i.    The appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and each such registered public accounting firm must report directly to the audit committee;

ii.    Reviewing audit results and annual and interim financial statements and discussing the audited financial statements with both the Company's outside auditors and the Company's management prior to any public filing of those reports;

iii.    Reviewing major issues regarding accounting principles and practices that could significantly impact the Company's financial statements;

iv.    Discussing with the Company's outside auditors the quality of accounting principles applied in the Company's financial statements and the other matters required by SAS 61 (including amendments or supplements}, such as management judgments and accounting estimates that affect financial statements, significant new accounting policies and disagreements with management;

v.    Overseeing the adequacy of the Company's system of internal accounting controls, including obtaining from the outside auditors management letters or summaries on such internal accounting controls;

vi.    Overseeing the Company's procedures for preparing published annual statements and management commentaries;

vii.    Overseeing the effectiveness of the internal audit function; and

viii.    Overseeing the Company's compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities.

In performing their duties as Audit Committee members, these defendants knew that the Company's financial statements were inaccurate and misleading, yet they knowingly approved the filing and dissemination of the financial statements, and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties; and

k.    Zou, Qiu, Johnson and Xie's knowing participation in the improper reporting practices, alleged herein, is not, and could not possibly be, the result of an exercise of good faith business judgment. There is not, and could not possibly be, a good faith business reason to publish at least one, if not two, sets of materially inaccurate and misleading financial statements. Likewise, there is not, and could not possibly be, a good faith business reason to grant Zou and Qiu an illegal and undisclosed "unsecured and interest free" loan. None of defendants' improper conduct is protected by the business judgment rule, and therefore no demand is required.

124.    Furthermore, as alleged in detail herein, defendants Zou and Qiu had a conflicting interest in and stood on both sides of the Dalian Rino Transactions. Accordingly, as a matter o flaw, the business judgment rule does not protect the Director Defendants' decisions to approve the Dalian Rino Transactions. Rather, the Director Defendants bear the burden of proving the entire fairness of the Dalian Rino Transactions, which they have not done and cannot do. Consequently, no demand on the Board is required.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

125.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

126.    As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

127.     First, the Individual Defendants knowingly implemented and engaged in improper reporting practices at RINO and knowingly filed inaccurate and inconsistent financial statements and other filings with the SEC and the SAIC, also attesting to their accuracy.  Thus, they breached their fiduciary duties of loyalty and good faith.

128.     Second, the Individual Defendants breached their fiduciary duties by knowingly failing to enforce the Entrusted Management Agreement between Dalian Rino and RINO which has resulted in RINO being never being paid hundreds of millions of dollars in management fees and knowingly allowing Dalian Rino to improperly borrow tens of millions of dollars from RINO, which were manifestly unfair to the Company.

129.     Thirdly, the Individual Defendants breached their fiduciary duties in connection with their approval of the Secondary Offering, which was not for the benefit of the Company, but rather to solely benefit Zou and Qiu.

130.     Lastly, the Individual Defendants further breached their fiduciary duties of loyalty and good faith by granting Zou and Qiu an illegal and undisclosed "unsecured and interest free" loan, in violation of Sarbanes-Oxley, as alleged herein.

131.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

132.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

133.     The terms of the $3.5 million loan to defendants Zou and Qiu and the Dalian Rino Transactions were so unfair to the Company that they constitute an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction.

134.     By approving and entering into the $3.5 million loan to Zou and Qiu and the Dalian Rino Transactions, the Individual Defendants wasted the Company's assets.

135.   As a direct and proximate result of the Individual Defendants' waste of corporate assets, the Company has sustained and will continue to sustain substantial damages as a result of excessive and unwarranted payments or the inequitable transfer of Company assets under the $3.5 million loan and the Dalian Rino Transactions, all self-dealing transactions complained of herein.

## COUNT III

### Against Defendants Zou and Qiu for Unjust Enrichment

136.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

137.   Defendants Zou and Qiu were unjustly enriched by their receipt of the illegal $3.5 million "unsecured and interest free" loan from RINO so that that they could purchase a residence in Orange County, California, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.  To remedy the such defendants' unjust enrichment, the Court should order them to pay to the Company market-rate interest on the loan they received from RINO, as well any portion of the principal balance that remains unpaid.

138.   Defendants Zou and Qiu were further unjustly enriched by the receipt of hundreds of millions of dollars of illicit profits the from the Secondary Offering and the failure of Dalian Rino to pay RINO under the Entrusted Management Agreement between RINO and Dalian Rino and the illegal lending of money from RINO to Dalian Rino.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Ordering Defendants Zou and Qiu to pay to the Company market-rate interest on the loan they received from RINO, as well as repay any portion of the principal balance that remains unpaid;

C.   Ordering Defendants Zou and Qiu to disgorge to the Company all amounts received from the proceeds of the Secondary Offering and the management fees that Dalian Rino was required to pay to RINO under the Entrusted Management Agreement;

D.   Imposing a constructive trust upon the excess proceeds from the sale of the California Houses;

1

E.    Ordering Defendants Zou and Qiu to disgorge to the Company the excess proceeds from the sale of the California Houses;

2

3

F.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

4

G.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

5

6

H.    Granting such other and further relief as the Court deems just and proper.

7

8

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

9

10

Dated:  May 3, 2013

Respectfully submitted,

11

**LAW OFFICES OF CURTIS B. COULTER, P.C.**

12

_____/s/ Curtis B. Coulter_____
Curtis B. Coulter

13

403 Hill Street,
Reno, Nevada 89501

14

Telephone: (775) 324.3380
Facsimile: (775) 324.3381

15

ccoulter@coulterlaw.net

16

17

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Robin Winchester

18

280 King of Prussia Road
Radnor, PA 19087

19

Telephone:  (610) 667-7706
Facsimile:  (267) 948-2512

20

rwinchester@ktmc.com

21

_Attorneys for Plaintiffs M. Aileen Morningstar and Alice Slettedahl_

22

23

24

25

26

27

28

## VERIFICATION

I, M. Aileen Morningstar, hereby verify that I have authorized the filing of the attached Verified Amended Shareholder Derivative Complaint, that I have reviewed the Verified Amended Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.   I declare under penalty of perjury that the foregoing is true and correct.

DATE: 4/30/13

M. AILEEN MORNINGSTAR

## VERIFICATION

I, Alice Slettedahl, hereby verify that I have authorized the filing of the attached Verified Amended Shareholder Derivative Complaint, that I have reviewed the Verified Amended Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: 5/1/13

_____
ALICE SLETTEDAHL